**William PABON, Plaintiff–Appellant,**

---

Felix Manuel **Ruiz** a/k/a Pedro Ruiz,[1] *Plaintiff,*

v.

Dr. Lester **WRIGHT,** Dr. Norman Selwin, Dr. Charles Bendheim, Dr. Vincent Marrone, Dr. Harry Mamis, Andrew Miller, Dr. Charles Rush, Dr. Bharat Dasani, Dr. Ravi Hotchandani, Dr. Robert Rosenzweig, Dr. Koenigsmann, Dr. Chakarvorty, Dr. Phillip Marrone, Jacqueleine A. Bodzak, and Catherine Metzler, *Defendants–Appellees.*[2]

**Docket Nos. 04–2896–RP(L); 04–2901–RP(CON).**

United States Court of Appeals, Second Circuit.

Submitted: Jan. 19, 2006.

Decided: Aug. 3, 2006.

---

1. After we dismissed Plaintiffs–Appellants' appeal for failure to comply with a scheduling order, Pabon, but not Ruiz, sought and obtained reinstatement of his appeal. Ruiz is therefore no longer a party to this action.

2. This caption varies from the official caption, which is incorrect in certain respects. The Clerk of the Court is directed to amend the official caption accordingly.

William Pabon, Stormville, NY, pro se.

David Lawrence III, Assistant Solicitor General (Eliot Spitzer, Attorney General of the State of New York, Michael S. Belohlavek, Senior Counsel, on the brief), New York City, NY, for State Defendants–Appellees.

Nancy A. Breslow, Martin Clearwater & Bell LLP (John L.A. Lyddane, on the brief), New York City, NY, for Private Defendants–Appellees.

Before WALKER, Chief Judge, NEWMAN and KATZMANN, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

William Pabon, an inmate at Green Haven Correctional Facility ("Green Haven"), was diagnosed with Hepatitis C. Under the care of physicians both at Green Haven and at a private clinic, he underwent a liver biopsy to verify the diagnosis and then was treated with both Interferon and Ribavirin. Pabon complains that his Hepatitis treatment was conditioned on his submission to a liver biopsy and that the Interferon treatment resulted in serious side effects about which he was not warned. He further claims that, had he known of the side effects associated with

liver biopsies and Interferon, he would have refused treatment. Pabon contends that these facts amount to a violation of a Fourteenth Amendment right to medical information.

▉ For the reasons that follow, we hold that Pabon is correct that the Fourteenth Amendment's recognized liberty interest in an individual's right to refuse medical treatment carries with it a concomitant right to such information as a reasonable patient would deem necessary to make an informed decision regarding medical treatment. To establish a violation of this right, a prisoner must show that (1) government officials failed to provide him with such information; (2) this failure caused him to undergo medical treatment that he would have refused had he been so informed; and (3) the officials' failure was undertaken with deliberate indifference to the prisoner's right to refuse medical treatment. We also recognize, however, that prison officials may administer treatment to an inmate despite that inmate's desire to refuse treatment if, in the exercise of their professional judgment, the officials reasonably determine that providing such treatment furthers a legitimate penological interest. Because this right was not clearly established in this circuit when Pabon was diagnosed with and treated for Hepatitis C, we affirm the district court's grant of summary judgment to all Defendants on qualified-immunity grounds.

## BACKGROUND

In October 1996, a laboratory test indicated that Pabon may have contracted Hepatitis C, a chronic viral liver disease that can increase the risk of liver cancer and can lead to inflammation, scarring, and cirrhosis of the liver. Cirrhosis ultimately can lead to liver failure and death.

The physicians at Green Haven referred Pabon to Dutchess Gastroenterologists, P.C. ("Dutchess") for additional testing. In May 1997, a doctor at Dutchess saw Pabon and, according to Defendants, recommended that Pabon undergo additional testing to confirm the preliminary Hepatitis C diagnosis. Pabon contends that he was forced to undergo these tests. In any event, the additional tests were performed, and they confirmed the initial diagnosis.

Pabon returned to Dutchess in July 1997 for further evaluation. Defendants maintain that, at that time, the doctors at Dutchess provided Pabon with information about Hepatitis C and Interferon, a medication used for the treatment of Hepatitis C, and discussed with Pabon the need for a liver biopsy. They also maintain that the prevailing standard of care in treating Hepatitis C includes performing a liver biopsy to assess the state of a patient's liver before prescribing Interferon.

According to Pabon, he was told that he must undergo a liver biopsy in order to receive treatment for his condition but was never informed of the possible complications or risks associated with liver biopsies. He maintains that the prevailing standard of care does not call for a biopsy and that had his treatment not been made contingent on undergoing the biopsy, he would have refused to submit to that procedure.

In October 1997, the liver biopsy was performed, and the following month, Dr. Bharat Dasani evaluated Pabon and prescribed Interferon. While Dr. Dasani does not recall a specific conversation with Pabon about Interferon's side effects, he claims that it is his custom and practice to have such a conversation with all patients being treated with Interferon. Pabon contends that he was never informed of Interferon's possible side effects.

Pabon began Interferon treatment in November 1997. Because his response to the Interferon therapy was incomplete as of October 1998, Dr. Thomas Rush, the consulting infectious-disease specialist at Green Haven, recommended the addition of Ribavirin, also used to treat Hepatitis C, to Pabon's treatment. Pabon claims that Dr. Rush failed to inform him of the possible side effects of Ribavirin treatment.

Pabon complained of gastric pain soon after his Interferon treatment began. As a result, he was examined at Dutchess on two occasions where Dr. Dasani recommended that Pabon take Zantac along with his Interferon. Pabon also maintains that he experienced numerous additional side effects of the biopsy and the Interferon/Ribavirin treatment, including dizziness, vomiting, abdominal pain, severe headaches, chronic depression, pain, suicidal thoughts, and impotence, and that these adverse effects led to marital problems.

By late 1999, Pabon exhibited a complete response to Hepatitis C therapy and the medications were discontinued. Since that time, Pabon's liver enzymes have remained normal, and his Hepatitis C viral load is undetectable. According to Pabon's doctors, this sustained response is the best outcome that could have been expected.

Despite this successful result, Pabon brought this § 1983 suit seeking damages for violations of his rights under the United States Constitution. The complaint names two groups of defendants: Pabon's doctors at Dutchess and his doctors and nurses at Green Haven. The district court construed Pabon's complaint to implicate only his Eighth Amendment rights and, finding no evidence of deliberate indifference, granted Defendants' summary judgment motion. This timely appeal followed.

## DISCUSSION

We review a district court's grant of summary judgment *de novo*. *Anderson v. Recore*, 446 F.3d 324, 328 (2d Cir.2006). Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party, *id.*, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c).

### I. Issues on Appeal

■ The district court considered only whether Pabon had submitted evidence sufficient to show a disputed issue of material fact with respect to an Eighth Amendment violation. To make out such a violation, an inmate must show that state officials acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Defendants do not dispute that Hepatitis C qualifies as a serious medical condition, but the district court found that Pabon had failed to put forth evidence that Defendants acted with deliberate indifference and therefore granted their summary judgment motion.

■ On appeal, Pabon fails to challenge this determination. Because Pabon's brief to this court does not contend that the district court erred in dismissing his Eighth Amendment claim, we consider that claim abandoned. *Cruz v. Gomez*, 202 F.3d 593, 596 n. 3 (2d Cir.2000) ("When a litigant—including a *pro se* litigant—raises an issue before the district court but does not raise it on appeal, the issue is abandoned."). We therefore will not review the dismissal of Pabon's Eighth Amendment claim.

■ Pabon's complaint also indicated that at least some of his claims arose under the Fourteenth Amendment. Ac-

cording to the district court, the Fourteenth Amendment is relevant to Pabon's claim only insofar as it makes the Eighth Amendment's ban on cruel and unusual punishment applicable to the states, and Defendants agree with this analysis. Pabon asserts that he raised a Fourteenth Amendment due process claim independent of the Eighth Amendment.

■ We construe complaints filed by *pro se* litigants liberally and "interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Pabon's appellate brief is wholly devoted to the argument, new to this court, that Defendants' alleged failure to inform him of the side effects of Interferon treatment and refusing to provide treatment pending a liver biopsy constitute violations of his Fourteenth Amendment substantive due process right to refuse medical treatment. Because this argument is based on facts that are alleged in Pabon's complaint, we conclude that Pabon did raise an independent Fourteenth Amendment claim in his complaint. The viability of the Fourteenth Amendment claim is thus the issue before us on appeal.

## II. Qualified Immunity

■ Even if Pabon's complaint states a Fourteenth Amendment claim, we must consider whether Defendants are entitled to summary judgment on qualified-immunity grounds. Determining this question is a two-step process. First, we must consider whether, viewed in the light most favorable to Pabon, "the facts alleged show the [official's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citing *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). At this stage of the inquiry, courts holding that a previously unrecog-

nized constitutional right exists must define its contours. Through this process, courts "set forth principles which will become the basis for a holding that a right is clearly established" in subsequent cases. *Id.* at 201, 121 S.Ct. 2151.

■ If the facts as alleged would not amount to the violation of a constitutional right, the qualified-immunity inquiry is at an end, and summary judgment must be granted. *Id.* "On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* According to this second inquiry, a qualified-immunity defense will be successful either when the defendants' actions did not violate clearly established law or when it was objectively reasonable for the defendants to believe that their actions did not violate such law. *Poe v. Leonard,* 282 F.3d 123, 133 (2d Cir.2002).

Applying these principles here, we first must determine whether Pabon has successfully alleged a violation of a right under the Fourteenth Amendment. If so, we then must decide whether summary judgment is nonetheless appropriate because the infringed-upon right was not clearly established at the time of the violation or because it was reasonable for Defendants to believe that they were not violating Pabon's rights.

### A. The Violation of a Constitutional Right

Determining whether Pabon's complaint describes the violation of a constitutional right requires us to consider whether the Fourteenth Amendment includes a substantive due process right to information regarding proposed medical treatment and, if so, to delineate the scope of that right.

### 1. The Right to Medical Information

While the contours of prisoners' rights will depend upon the requirements of prison administration and prison life, the Supreme Court has told us that inmates do not abandon their constitutional rights at the prison door. *E.g., Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (prisoners retain the right to petition the government for the redress of grievances, the right to protection against invidious racial discrimination, and the right to due process). And as the Supreme Court stated in *Cruzan v. Director, Missouri Department of Health,* a "person has a constitutionally protected liberty interest in refusing unwanted medical treatment." 497 U.S. 261, 278, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990); *see also Washington v. Harper,* 494 U.S. 210, 221, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (recognizing a prisoner's "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs").

■■ While decisions regarding medical treatment are normally private matters to be resolved between an individual and his or her physician, when these decisions occur in the prison setting, the government has a role. The state is obligated to provide medical care to those that it has incarcerated and thus made dependent on the care and services that it provides. *Estelle,* 429 U.S. at 103, 97 S.Ct. 285. As a result, these decisions usually involve state action. Because § 1983 liability attaches only when the constitutional deprivation is the result of state action, the following discussion applies only to doctors or other prison officials that are acting under color of state law. *See* 42 U.S.C. § 1983; *see also Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 156, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (recognizing liability under § 1983 for private individuals who cause a deprivation of a constitutional right when acting under color of state law).

In *White v. Napoleon,* 897 F.2d 103 (3d Cir.1990), the Third Circuit upheld a prisoner's claim that a prison doctor's refusal to answer his questions about prescribed medication violated the prisoner's Fourteenth Amendment rights. The court first recognized that prisoners, like nonincarcerated citizens, have a right to refuse medical treatment. *Id.* at 111. It then reasoned that the right to refuse that treatment has little meaning without sufficient knowledge of what the treatment entails. *Id.* at 113. Consequently, it held that "[p]risoners have a right to such information as is reasonably necessary to make an informed decision to accept or reject proposed treatment," *id.,* as well as a reasonable explanation of the viable alternative treatments available to them in the prison setting, *id.; see also Benson v. Terhune,* 304 F.3d 874, 884–85 (9th Cir.2002) (noting the Third Circuit's recognition of the right to medical information and describing it as a "reasonable application of Supreme Court precedent"); *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1049 (S.D.N.Y.1995) (holding that the "failure to provide such information as is sufficient to informed consent in a manner permitting the inmate/plaintiff to make a knowledgeable evaluation" of his options is a violation of the inmate's due process rights to be free from unwanted medical treatment).

We agree with the Third Circuit that an individual cannot exercise his established right to refuse medical treatment in a meaningful and intelligent fashion unless he has sufficient information about proposed treatment. Absent knowledge of the risks or consequences that a particular treatment entails, a reasoned decision about whether to accept or reject that treatment is not possible. We therefore hold that, in order to permit prisoners to

exercise their right to refuse unwanted treatment, there exists a liberty interest in receiving such information as a reasonable patient would require in order to make an informed decision as to whether to accept or reject proposed medical treatment. *See White*, 897 F.2d at 113 ("Prisoners have a right to such information as is reasonably necessary to make an informed decision to accept or reject proposed treatment....").

■■■ The entitlement to this information, however, is far from absolute. To establish a violation of the constitutional right to medical information, a prisoner must satisfy an objective reasonableness standard, must demonstrate that the defendant acted with the requisite state of mind, and must make a showing that the lack of information impaired his right to refuse treatment.

### i. Objective Standard

The right to medical information has an objective component. The prisoner is entitled only to such information as a reasonable patient would deem necessary to make an informed decision. This objective requirement limits the scope of the right in at least three ways. First, it precludes liability in cases where a prisoner may not have received all conceivable information regarding a particular treatment but a reasonable person would not find the missing information necessary to a decision regarding whether to go forward with that treatment. Second, it recognizes that prisoners' requests for information "may range from reasonable to obstructionist." *White*, 897 F.2d at 113. Prisoners may not interfere with a prison's ability to provide medical attention to its inmates in an orderly, efficient manner by demanding unnecessary information during physician visits. Finally, it is not unlikely that, after receiving appropriate treatment that proved to have unpleasant side effects, a prisoner might claim that he had not received sufficient information to allow him to decide whether to refuse that treatment. To avoid liability in such situations, a doctor should not be required to provide each prisoner-patient with an exhaustive list of all the possible adverse effects of each aspect of his treatment. Instead, a doctor simply must provide a prisoner with such information as a reasonable patient would find necessary to making an informed decision regarding treatment options.

### ii. Defendants' State of Mind

■■■ Inadvertent failures to impart medical information cannot form the basis of a constitutional violation. The simple lack of due care does not make out a violation of either the substantive or procedural aspects of the Due Process Clause of the Fourteenth Amendment. *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Daniels v. Williams*, 474 U.S. 327, 332, 106 S.Ct. 677, 88 L.Ed.2d 662 (1986). In *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the Supreme Court considered what sort of executive action could qualify as a substantive due process violation. In that case, the parents of a motorcycle passenger killed in a high-speed police chase brought a § 1983 claim alleging deprivation of their son's substantive due process right to life. *Id.* at 837, 118 S.Ct. 1708. The Court began its analysis by reiterating that " 'the touchstone of due process is protection of the individual against arbitrary action of government.' " *Id.* at 845, 118 S.Ct. 1708(quoting *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)) (alteration marks omitted). In the context of executive action, this means that the Due Process Clause is offended only if the government's abuse of power "shocks the conscience." *Id.* at 846, 118 S.Ct. 1708; *see*

*also id.* at 847 n. 8, 118 S.Ct. 1708 (1998) ("[T]he threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.").

In determining that injuries caused by high-speed chases do not give rise to Fourteenth Amendment liability unless the officers intend to harm the injured party, *County of Sacramento* recognized that the requisite state of mind for action by an executive official to satisfy the "shocks the conscious" test will vary according to the circumstances. *Id.* at 849–51, 118 S.Ct. 1708. Exigent circumstances, such as when prison officials are faced with a riot or when police encounter a situation calling for an immediate response, require that government actors make instant judgments that honor their competing obligations both to restore order and to act with restraint. In such crises, "even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'" *Id.* at 853–54, 118 S.Ct. 1708(quoting *Daniels,* 474 U.S. at 332, 106 S.Ct. 677).

By contrast, in situations where actual deliberation is possible, such as in the normal custodial circumstances of a prison, the state's duty to take responsibility for the inmates' safety and well-being " 'does not ordinarily clash with other equally important governmental responsibilities.'" *Id.* at 851–52, 118 S.Ct. 1708 (quoting *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). As a result, "forethought about an inmate's welfare is not only feasible but obligatory." *Id.* at 851, 118 S.Ct. 1708.

■ In establishing this dichotomy, *County of Sacramento* strongly suggests that in those circumstances when actual deliberation is possible, a showing of delib-

erate indifference will establish Fourteenth Amendment liability. *See id.* at 850–53, 118 S.Ct. 1708 ("[L]iability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations."). Following the reasoning of *County of Sacramento,* we hold that in order to incur liability a prison official's failure to adequately inform a patient regarding that patient's proposed medical treatment must be done with, at a minimum, deliberate indifference to the prisoner's right to refuse treatment and that simple negligence will not suffice.

### iii. Impairment of the Right to Refuse Treatment

■ We emphasize that the right to medical information is not, in and of itself, an independent right. Rather, it is a derivative of the right to refuse treatment and extends only to those circumstances in which it will effectuate a patient's exercise of that underlying right. So as a threshold matter, a prisoner must show that, had he received information that was not given to him, he would have exercised his right to refuse the proposed treatment. *Cf. Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (holding that, to state a claim for denial of the right to access the courts, a prisoner must demonstrate that "the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim"). That is to say, a prisoner must be able to establish that the underlying right at stake—the right to refuse treatment—actually was impaired by the state's failure to impart necessary information to the prisoner-patient. If a prisoner still would have accepted the proposed treatment, even if he had been given all of the neces-

sary information regarding that treatment, then his right to refuse treatment has not been impaired, and the deprivation of medical information is of no consequence.

### 2. Balancing Interests

 A determination that a prisoner's right to refuse medical treatment has been impaired does not end the inquiry. A prisoner can establish liability for the violation of a constitutional right only if his individual liberty interest outweighs the relevant countervailing state interests. *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. The prisoner's interest in being provided with information about proposed medical treatment and his right to refuse that treatment must be balanced against the state's interest in effective prison administration. The importance of this state interest is not open to debate, and the Supreme Court has instructed us generally as to where to strike the balance between the state's interest and prisoners' constitutional rights: The state may infringe upon a prisoner's constitutional rights so long as the infringing regulation or policy is " 'reasonably related to legitimate penological interests.' " *Washington*, 494 U.S. at 223, 110 S.Ct. 1028(quoting *Turner*, 482 U.S. at 89, 107 S.Ct. 2254). This standard applies when "determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights ... even when the constitutional right claimed to have been infringed is fundamental, and the State under other circumstances would have been required to satisfy a more rigorous standard of review." *Id.* at 223, 110 S.Ct. 1028.

 Therefore a prisoner's right to refuse medical treatment need not be honored if legitimate penological interests require the prisoner to be treated. If prison officials, including doctors, identify situations in which they reasonably believe that treatment is required, notwithstanding the prisoner's asserted right to refuse it, the right must give way. Obvious examples would be the treatment of an infectious disease, avoidance of contaminations, or prevention of disruption by illness-induced behaviors. On the other hand, one can conceive of instances when legitimate penological interests would not justify interfering with a prisoner's rights to medical information and to refuse treatment, such as end-of-life decisions. Thus, a prison may compel a prisoner to submit to treatment despite his general right to refuse such treatment when prison officials, "in the exercise of professional judgment, deem it necessary to carry out" legitimate penological objectives. *White*, 897 F.2d at 113.

If legitimate penological interests dictate that a particular treatment must be administered even if the prisoner would have refused it, then because there is no constitutional right to refuse treatment, there is no corollary right to be informed about the treatment. The Constitution does not require prison officials to convey information intended to allow the prisoner to exercise a right that is unavailable to him. We leave to prison officials and physicians the determination of what information is appropriately passed along to prisoner-patients in situations where treatment is mandated.

### 3. The Eighth vs. the Fourteenth Amendment

We turn to Defendants' argument that, because complaints of inadequate medical treatment of prisoners are governed by the Eighth Amendment, *Estelle*, 429 U.S. at 104, 97 S.Ct. 285, the right to medical information asserted by Pabon could not be found in the Fourteenth Amendment.

The Supreme Court has instructed that "[t]he first step in any [§ 1983] claim is to identify the specific constitutional right al-

legedly infringed." *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (citing *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). If "a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.' " *Id.* at 273, 114 S.Ct. 807(quoting *Graham,* 490 U.S. at 395, 109 S.Ct. 1865).

■ Our view that the right to medical information is grounded in the Fourteenth and not the Eighth Amendment arises from our understanding of the fundamental difference between the rights afforded by each amendment. The Eighth Amendment governs the way in which medical treatment is administered to prisoners because, as the Supreme Court recognized in *Estelle,* serious medical conditions can result in cruel and unusual punishment if not properly addressed. 429 U.S. at 104, 97 S.Ct. 285. Thus, the protections of the Eighth Amendment reach decisions by prison authorities regarding the manner in which they provide medical care to inmates because improper care may result in the wanton and unnecessary infliction of pain.

■ The Fourteenth Amendment, by contrast, protects the individual's liberty interest in making the decisions that affect his health and bodily integrity. The right to make these decisions, and the corollary right to the information neces-

sary to make them intelligently, is recognized in order to vindicate this fundamental liberty interest in bodily integrity, not to protect against treatment that may amount to cruel and unusual punishment. So rather than concerning itself with *prison officials'* decisions, it governs *individuals'* decisions regarding the administration of treatment. These two very different motivations implicate different constitutional protections and justify basing the right to medical information on the Fourteenth Amendment rather than the Eighth.[3]

### 4. Whether Pabon's Constitutional Rights Were Violated

■ Having defined the contours of the Fourteenth Amendment right to medical information, we now turn to whether Pabon has successfully alleged a violation of that right. To the extent Pabon's claim alleges that requiring him to undergo a liver biopsy before considering him eligible for Hepatitis C treatment constituted a violation of his right to refuse medical treatment, we find no constitutional violation. Pabon's doctors concluded that a liver biopsy was a necessary predicate to prescribing Interferon to treat Pabon's Hepatitis C and that prescribing Interferon without performing a prior biopsy was a medically unsound course of action. Pabon remained free to refuse to undergo the biopsy and hence to remain ineligible for Interferon treatment. But he did not exercise that right; instead, because he apparently wanted to avail himself of the benefits of Interferon, he consented to un-

---

**3.** We recognize that, in rare instances, a failure to impart information to a prisoner regarding his medical treatment might constitute an Eighth Amendment violation. For example, a prison official hypothetically might take advantage of a prisoner's medical condition to inflict pain on that prisoner by recommending a treatment with painful or debilitating side effects without informing the prisoner of those consequences. Such a course of action would implicate the same concerns that have prompted the Supreme Court to apply Eighth Amendment scrutiny to the medical care of prisoners. This case, however, does not present such a scenario.

dergo the biopsy. Pabon was therefore not forced to undergo a biopsy. He was simply presented with the option of either consenting to the course of treatment prescribed by his physicians—a biopsy to determine that Interferon was appropriate followed by the Interferon—or to refuse treatment altogether. He chose the former.

Pabon's stronger claim is that Defendants violated his constitutional rights by performing a biopsy and administering Interferon without providing him sufficient information so as to be able to make an informed decision regarding whether to accept or refuse such treatment. This allegation implicates Pabon's right to medical information. Pabon has submitted evidence, first, that he was not informed of the risks and side effects associated with either liver biopsies or Interferon/Ribavirin treatment and, second, that had he been aware of those risks and side effects, he would have declined treatment. Finally, Pabon's complaint implies that at least some Defendants acted with the intent to induce Pabon to undergo treatment that he otherwise might have declined. *See* Second Amend. Compl. ¶ 53("Dr. Rush was fully aware of the extremely severe and dangerous side effects of [the prescription drugs administered to Pabon.] Nevertheless, Dr. Rush falsely informed Pabon that there were no side effects ... with full knowledge ... that Pabon participated in conjugal visits ... with his wife."). As a result, we think that the allegations contained in Pabon's complaint successfully make out a violation of his constitutional right to medical information. Despite the allegations in Pabon's complaint, the district court determined that the evidence submitted by Pabon was insufficient to show that Defendants acted with anything more than negligence. Because we find that the right to medical information was not clearly established at

the time of Pabon's treatment, *see infra,* we need not search the record to determine whether Pabon submitted evidence from which a reasonable fact-finder could have inferred that Defendants acted with deliberate indifference or whether the district court's finding of nothing more than negligence was correct.

We note here that, because the district court understandably failed to analyze Pabon's claim according to the framework we set forth in this opinion, the record below was not developed with respect to whether legitimate penological interests would permit state officials to insist that a prisoner undergo medical treatment for Hepatitis C over that prisoner's objections. Without the benefit of such a factual record, we express no opinion here as to whether the administration of a liver biopsy or Interferon treatment to prisoners who test positive for Hepatitis C despite the prisoners' desire to forego such treatment would be constitutionally permissible.

## B. Whether the Right Was Clearly Established

"[P]ublic officials ... are protected by qualified immunity from civil liability for actions taken in their official capacity, if those actions were objectively reasonable in light of clearly established rules then extant." *Morris–Hayes v. Bd. of Educ.,* 423 F.3d 153, 158 (2d Cir.2005). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

▮ At the time of Pabon's Hepatitis C treatment, it was clearly established that the Fourteenth Amendment confers the right to refuse medical treatment. *See Cruzan,* 497 U.S. at 278, 110 S.Ct. 2841.

The concomitant right to medical information was not clearly established, however, because neither this court nor the Supreme Court had recognized such a right at that time. Thus, no official would have been aware that the failure to provide Pabon with such information as a reasonable patient would find necessary to make an informed decision regarding treatment was a violation of his substantive due process rights.

We do not agree with Pabon that *White*, *Benson*, and *Clarkson* render this right to medical information clearly established. When neither the Supreme Court nor this court has recognized a right, the law of our sister circuits and the holdings of district courts cannot act to render that right clearly established within the Second Circuit. *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir.2003) ("[C]learly established [means that] (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" (quoting *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir.1998))). Defendants are therefore entitled to qualified immunity.[4]

### CONCLUSION

For the foregoing reasons, we affirm the district court's judgment granting summary judgment to Defendants.

---

4. Because we conclude that all Defendants are entitled to qualified immunity because the right to medical information was not clearly established at the time of Pabon's diagnosis and treatment, we need not address the argument of some Defendants that they are not liable because they are not state actors.