In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1740

DEWAYNE D. KNIGHT,

*Plaintiff-Appellant,*

*v.*

THOMAS GROSSMAN, JR., M.D.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:16-cv-1644 — **William E. Duffin**, *Magistrate Judge.*

ARGUED SEPTEMBER 17, 2019 — DECIDED OCTOBER 31, 2019

Before FLAUM, ROVNER, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* DeWayne Knight is a prisoner who went under the knife for one surgery and Dr. Thomas Grossman, upon seeing during the operation that he made the wrong diagnosis, performed another. Knight brought suit under 42 U.S.C. § 1983, alleging that Dr. Grossman acted with deliberate indifference to his medical needs in violation of the Eighth Amendment and disregarded his right to informed consent in violation of the Fourteenth Amendment. The

district court entered summary judgment in Dr. Grossman's favor on both claims. In considering Knight's due process claim, the district court correctly observed that we have never endorsed a right to informed consent or pronounced a standard for proving a violation of that right. We do so now by adopting the standard the Second Circuit articulated in *Pabon v. Wright*, 459 F.3d 241 (2006). But because Knight did not sufficiently prove the elements of either of his claims, we affirm the district court's judgment.

## I

The summary judgment record supplies the operative facts, and we draw all inferences in the light most favorable to Knight. See *Yochim v. Carson*, 935 F.3d 586, 588 (7th Cir. 2019).

While serving a sentence at the Waupun Correctional Institution, DeWayne Knight sought treatment for a basketball injury to his left knee. Prison staff referred Knight to Dr. Grossman, who worked at a hospital that contracted with the Wisconsin Department of Corrections to provide medical services to state prisoners. Dr. Grossman diagnosed Knight with a tear in his anterior cruciate ligament and performed reconstruction surgery. This surgery was successful and is not at issue in this litigation.

A few years later, Knight reinjured his knee and returned to Dr. Grossman for treatment. Dr. Grossman examined Knight, ordered x-rays, and, without consulting an MRI, diagnosed him with a torn ACL revision. Dr. Grossman offered Knight the option of undergoing a revision procedure to repair the tear. In doing so, he issued a series of disclaimers, explaining that the surgery was elective and not strictly

necessary, involved certain risks, and did not bring with it a promise that it would resolve Knight's pain. Knight agreed to the surgery and opted for a type of reconstruction procedure that would require Dr. Grossman opening both knees and transplanting tissue from Knight's healthy right knee into his left knee.

On the day of the surgery, Knight signed a consent form authorizing a "[r]evision left anterior cruciate reconstruction with donor site from right knee." The form also provided that if "unforeseen conditions" arose during the surgery which, in Dr. Grossman's judgment, required additional or different procedures, he had Knight's consent to take any further steps "deemed necessary and advisable." Upon opening Knight's left knee, Dr. Grossman was met with a different condition than he anticipated—Knight's ACL was intact and functional, not torn. But Dr. Grossman observed other issues with Knight's left knee, including surface damage to the cartilage (grade three changes in the trochlea), narrowing of the space between the two bumps at the end of the thigh bone (dense stenosis on the lateral side on the intercondylar notch, with a small bone fragment), and bony overgrowths on the kneecap (patellar osteophytosis). An experienced surgeon, Dr. Grossman determined what he was seeing was consistent with degenerative joint disease or arthritis and would explain why Knight was experiencing renewed pain and discomfort in his left knee.

Dr. Grossman knew immediately how to treat Knight. He could continue operating by using the two small incisions that had already been made to Knight's left knee to perform a series of arthroscopic surgical procedures. In medical terms, a procedure known as a chondroplasty would remove the

damaged tissue and a second procedure, a notchplasty, would enlarge the narrowed gap to address the thigh-bone issue. As for the kneecap, Dr. Grossman could perform an abrasion arthroplasty—a procedure that required (in simplified terms) shaving the bone to a degree that stimulated the bone marrow to generate new cartilage.

So Dr. Grossman found himself at a fork in the road: with Knight unconscious on the operating table, he could close Knight's knee and end the operation or move forward with the alternative procedures he had not discussed with Knight but believed would help him. Dr. Grossman chose to keep operating. He later explained that he did so not only because he was confident the alternative procedures would address Knight's condition, but also because it was unclear if or when Knight, as a prisoner, would be available for surgery again.

Knight woke up in the recovery room to find that only his left knee had been operated on. No one told Knight that Dr. Grossman had changed course mid-operation and performed an alternative surgery—one they had never discussed. Upon Knight's discharge from the hospital, Dr. Grossman sent his operative note and recovery instructions to the prison's medical unit. The note explained what Dr. Grossman had observed, including Knight's intact ACL, and the procedures he performed, including the abrasion arthroplasty. Dr. Grossman instructed that Knight could stand and put whatever weight on his left knee he was able to tolerate, even though recovery from abrasion arthroplasty requires that the patient avoid putting any weight on the knee so that the new cartilage can mature. Three months after the surgery, Knight had a follow-up appointment with Dr. Grossman, where he

finally learned the details of his surgery. Knight's knee has since gotten worse.

Litigation then followed. Knight brought suit against Dr. Grossman under 42 U.S.C. § 1983, claiming that the treatment he received for his knee violated his Eighth and Fourteenth Amendment rights. Dr. Grossman moved for summary judgment on both claims, and the district court granted his motion. Knight now appeals.

## II

We start with Knight's claim that Dr. Grossman acted with deliberate indifference to his medical needs. We do so by taking our own fresh look at the record evidence, construing all facts in Knight's favor. See *Lavite v. Dunstan*, 932 F.3d 1020, 1027 (7th Cir. 2019).

The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain," which includes "[d]eliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). To prevail on this claim, Knight must prove not only that he suffered from an objectively serious medical condition, but also that a state official responded with deliberate indifference to the condition. See *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016).

Dr. Grossman does not dispute that Knight's knee condition is an objectively serious medical condition or that he qualifies as a state official, leaving deliberate indifference the only contested element. A prison official is deliberately indifferent only if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The inquiry is subjective and requires that the official know "facts from which he could infer that a substantial

risk of serious harm exists, and he must actually draw the inference." *Whiting*, 839 F.3d at 662. "[E]vidence of medical negligence is not enough to prove deliberate indifference." *Id*.

Knight advances his Eighth Amendment claim by insisting that Dr. Grossman was deliberately indifferent to his right to informed consent. Framing the issue that way sends the parties down the wrong analytical path, however. Knight's Eighth Amendment claim is one for deliberate indifference to his serious medical needs, not deliberate indifference to a right to informed consent. Knight's liberty interest in informed consent to particular medical treatment is the province of the Fourteenth Amendment.

Take, for example, a prisoner with a malignant but treatable tumor. If a doctor discovers and removes the tumor while treating a hernia, nobody would say the doctor acted with deliberate indifference to the prisoner's medical needs. To the contrary, the physician, albeit without affording the prisoner the right to choose a course of medical care, saved the inmate's life. Put another way, at least in this case, whether Knight consented to the abrasion arthroplasty is irrelevant to his Eighth Amendment claim for deliberate indifference to his medical needs.

On this record, we conclude that no reasonable jury could find that Dr. Grossman acted with deliberate indifference to Knight's knee condition. Nothing suggests, much less suffices to show, that Dr. Grossman knew of and disregarded a substantial risk to Knight's condition or somehow denied or delayed treatment. All evidence points the opposite way: Dr. Grossman came upon an unexpected diagnosis during surgery, identified an alternative treatment course, and then traveled that new path—all to help Knight.

Knight urges a different perspective on the view that Dr. Grossman provided the wrong treatment or even deficient care. Apart from finding no footing in the facts, this theory faces an uphill climb on the law, as, unlike in a malpractice tort claim, medical professionals receive significant deference when their judgments encounter challenges under the Eighth Amendment. See *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 519 (7th Cir. 2019). The standard is not whether a reasonable medical professional would have made the same choice as Dr. Grossman, but instead whether "no minimally competent professional" would have done so. *Id*. "[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim." *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc).

Knight failed to meet this demanding standard. The record does not support a finding that either the abrasion arthroplasty or the inadequate recovery instructions deviated from accepted medical standards. Knight's own expert opined only that Dr. Grossman's failure to obtain a new informed consent and discuss alternative treatment opinions deviated from professional standards. From there, though, the expert's opinions say nothing about whether the abrasion arthroplasty, the failure to tell Knight about it, or the recovery instructions aligned with medical standards, let alone whether those choices were such substantial deviations that a jury could find deliberate indifference.

To be sure, expert testimony is not always necessary. See *id*. Here, however, none of the alleged errors are so obvious that a lay juror could assess whether Knight carried his burden in challenging Dr. Grossman's treatment. In the end, all

we can say is that Knight may have marshaled enough evidence to cast doubt on the wisdom of Dr. Grossman's choice to perform the abrasion arthroplasty—a procedure that, at least in some circles, is considered controversial and outdated. But most medical treatments carry risk, and without evidence that Dr. Grossman's choices carried risk so high that no minimally competent doctor would have done the same, Knight cannot prevail. The district court was right to grant summary judgment on the Eighth Amendment claim.

## III

We now venture into newer territory to address Knight's due process claim. The Fourteenth Amendment protects against deprivations of life, liberty, and property without due process of law. The Supreme Court has recognized that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990). So, too, has the Court held that prisoners retain a liberty interest in refusing forced medical treatment while incarcerated. See *Washington v. Harper*, 494 U.S. 210, 221–22 (1990).

From the interest in refusing unwanted treatment, some courts have inferred the existence of a corollary right—the right to receive information required to decide whether to refuse treatment. See, *e.g.*, *Pabon v. Wright*, 459 F.3d 241, 249–50 (2d Cir. 2006); *Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002); *White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990). On at least two occasions we have reserved judgment on the existence of this right. See *Cox v. Brubaker*, 558 F. App'x 677, 678–79 (7th Cir. 2014); *Phillips v. Wexford Health Sources, Inc.*, 522 F. App'x 364, 367 (7th Cir. 2013).

We now join all other circuits to have considered the question in holding that prisoners have a Fourteenth Amendment right to informed consent. The right to refuse medical treatment carries with it an implied right to the information necessary to make an informed decision about whether to refuse the treatment. Without crucial information about the risks and benefits of a procedure, the right to refuse would ring hollow. Together, the right to refuse treatment and the right to information required to do so constitute a right to informed consent. This due process entitlement has similarities to the familiar common law doctrine with which it shares its name, see *Cruzan*, 497 U.S. at 269–70 (describing the common law roots of informed consent), but its constitutional origin imposes different requirements than an informed-consent tort claim.

## A

The Second Circuit confronted the requirements for what it termed a Fourteenth Amendment "right to medical information" claim in its 2006 decision in *Pabon v. Wright*, 459 F.3d 241. While incarcerated, William Pabon underwent a liver biopsy and medication therapy for Hepatitis C. *Id*. at 245. He claimed that he was not warned of the serious side effects and brought a § 1983 claim based on the violation of a Fourteenth Amendment right to medical information. *Id*. at 245–46. Relying on *Cruzan* and *Harper*, the Second Circuit recognized a constitutional entitlement to medical information but emphasized that it was "far from absolute." *Id*. at 249–50. The court highlighted four limitations on the right.

The first three limitations address what the prisoner must prove to establish a violation of his right to medical information. Two of the limitations are necessary because the

logical source of the right to medical information is the right to refuse treatment, so the right to medical information exists only as far as needed to effectuate the right of refusal. *Id*. at 251. *First*, the prisoner "must show that, had he received information that was not given to him, he would have exercised his right to refuse the proposed treatment." *Id*. *Second*, "[t]he prisoner is entitled only to such information as a reasonable patient would deem necessary to make an informed decision." *Id*. at 250. This limitation avoids imposing an onerous burden of disclosing "all conceivable information" about a treatment and reduces the opportunity for the right to be used for "obstructionist" gain. *Id*.

*Third*, the prisoner must prove that the defendant acted with deliberate indifference to his right to refuse medical treatment. *Id*. at 251. Neither negligence nor gross negligence is enough to support a substantive due process claim, which must be so egregious as to "shock the conscience." See *County of Sacramento v. Lewis*, 523 U.S. 833, 848–49 (1998); *McDowell v. Vill. of Lansing*, 763 F.3d 762, 766 (7th Cir. 2014). In selecting deliberate indifference as the appropriate state of mind requirement as opposed to a more stringent intentionality standard, the Second Circuit relied on the Supreme Court's observation in *Lewis* that "liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." 523 U.S. at 853. The Court reasoned that in this context of "such extended opportunities to do better" and "protracted failure even to care, indifference is truly shocking." *Id*.

This element is the one Knight more vigorously contests, arguing that imposing a deliberate indifference requirement inappropriately "collapses the distinct right to informed consent granted under the Fourteenth Amendment into the prohibition against deliberate indifference to a prisoner's serious medical needs provided for under the Eighth Amendment." We disagree. Knight's position misses a key distinction, which hinges on what the defendant must be deliberately indifferent to. In an Eighth Amendment claim, the question is whether the defendant was deliberately indifferent to the prisoner's serious medical need. But here, in a Fourteenth Amendment due process claim, we ask whether the defendant was deliberately indifferent to the prisoner's right to refuse treatment. Though both require deliberate indifference, the inquiries are distinct.

Stepping back illuminates the distinction. A physician is deliberately indifferent to a patient's right to refuse treatment if the doctor subjectively knows that the patient did not consent to the treatment or that the patient would want to know the medical information being withheld in order to decide whether to refuse the treatment. But a physician can be deliberately indifferent to a prisoner's right to refuse treatment without being deliberately indifferent to his medical needs. Our tumor example shows as much.

The final limitation the Second Circuit outlined in *Pabon* is a safety valve of sorts—allowing the right to medical information to give way when outweighed by a countervailing state interest. A prisoner's right to refuse medical treatment can be infringed by a prison regulation that is "reasonably related to legitimate penological interests." *Harper*, 494 U.S. at 246 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). A

common example is when forced medication is needed to avoid the spread of contagious disease or to quell disruptive behavior. As the Second Circuit explained, "[i]f legitimate penological interests dictate that a particular treatment must be administered even if the prisoner would have refused it, then because there is no constitutional right to refuse treatment, there is no corollary right to be informed about the treatment." *Pabon*, 459 F.3d at 252.

B

We agree with the Second Circuit's reasoning and adopt the *Pabon* standard. A prisoner's claim of the violation of his right to informed consent is evaluated under a two-step inquiry. The prisoner must first establish that his right to informed consent was violated. To do this, the prisoner must prove that (1) he was deprived of information that a reasonable patient would deem necessary to make an informed decision about his medical treatment, (2) the defendant acted with deliberate indifference to the prisoner's right to refuse treatment, and (3) if the prisoner had received the information, he would have refused the treatment. If the prisoner establishes that his right to informed consent has been violated, we then take the second and final step of balancing the prisoner's right to informed consent against countervailing state interests. Liability arises only if, in the end, the prisoner's right outweighs the state interests.

C

We question whether Knight has sufficiently shown that Dr. Grossman was deliberately indifferent to his right to refuse treatment, particularly given the scope of the consent form. But we can stop short of answering that question

because, at the very least, Knight failed to show that he would have refused the only procedure he contests (the abrasion arthroplasty) had he been fully informed. Knight's express position below was that he "may well have" chosen a different treatment. Even if he had submitted that view in a sworn affidavit, which he did not, it would have fallen short: saying he may have refused treatment is not the same as saying he would have. With this failure of proof, the district court properly granted Dr. Grossman summary judgment.

For these reasons, we AFFIRM.