In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1012

JEREMY LOCKETT,

*Plaintiff-Appellant,*

*v.*

TANYA BONSON and BETH EDGE,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:17-cv-00691-WCG — **William C. Griesbach**, *Chief Judge.*

ARGUED MAY 17, 2019 — DECIDED AUGUST 28, 2019

Before RIPPLE, MANION, and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Jeremy Lockett, an inmate at the Wisconsin Secure Program Facility ("WSPF"), brought this action under 42 U.S.C. § 1983 to recover for alleged violations of his constitutional rights under the Eighth Amendment to the Constitution of the United States, rights made

applicable to the states through the Fourteenth Amendment.[1] He alleged that these rights were violated when he received inadequate medical care while incarcerated at WSPF. Mr. Lockett, who has sickle cell disease, claimed that two prison medical staff members, Tanya Bonson, a nurse practitioner ("NP"), and Beth Edge, a nurse, were deliberately indifferent to his serious medical needs. The defendants moved for summary judgment; the district court granted the motion. Mr. Lockett filed a timely appeal.

We conclude that the record will not support a jury determination that NP Bonson was deliberately indifferent to Mr. Lockett's needs in prescribing medication. Mr. Lockett did not exhaust his administrative remedies on his claim against Nurse Edge. Accordingly, the judgment of the district court is affirmed.[2]

## I.

## BACKGROUND

### A.

Mr. Lockett has been housed at WSPF, a facility within the Wisconsin Department of Corrections ("WDOC"), since November 2014. He has a significant medical history, having been diagnosed with sickle cell disease, a chronic condition that causes pain, sometimes acutely. During certain periods called sickle cell crises, the pain becomes so severe that it requires immediate emergency medical treatment. A sickle cell

---

[1] *Estelle v. Gamble*, 429 U.S. 97, 101, 104 (1976).

[2] The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1331. Our jurisdiction is based on 28 U.S.C. § 1291.

crisis usually resolves within five to seven days, although a severe crisis may result in pain that persists for weeks or months.

Other factors further complicate Mr. Lockett's health situation. His records contain a diagnosis of cannabis dependence, antisocial personality disorder, adjustment disorder, and mild depression in 2010.[3] He also has a documented history of substance abuse, including marijuana, ecstasy, and cocaine. Health care providers have prescribed various medications to treat his depression.

The events underlying his claims occurred over a several-month period at the end of 2016. On September 2, 2016, Mr. Lockett sent a health services request, complaining that his routine pain medication, tramadol, was not working to control his back pain. In response, NP Bonson switched Mr. Lockett's pain medication to Tylenol #3, a mild opioid. Five days later, on September 7, 2016, a medical staff member (whose name does not appear in the record) evaluated Mr. Lockett. According to Mr. Lockett, during this evaluation, he told the caregiver that his Tylenol #3 was not controlling his pain. The relevant entry on his chart does not reflect, however, any discussion of the efficacy of his pain medication—only that Mr. Lockett had reported to the medical department so that laboratory work could be undertaken and his neck pain evaluated and treated. Shortly thereafter, NP Bonson renewed Mr. Lockett's prescription for Tylenol #3, first for a period of two weeks and then for another month.

─────────────

[3] *See* R.42-4 at 4.

Throughout the month of September, Mr. Lockett remained on Tylenol #3, administered four times daily on what the WSPF terms medication passes.[4] From September 23 through September 25, he missed several doses, at least once because he declined it. Between September 26 and October 3, Mr. Lockett did not receive his pain medication at all. Although he filed a health services request during that time, he asked only about whether he would have an appointment with a specialist for his sickle cell disease and did not mention the lack of pain medication.

On October 3, 2016, medical staff determined that Mr. Lockett was in sickle cell crisis. In accordance with the emergency nursing protocol, he was transferred to the local emergency room for treatment. When he returned to the WSPF the following day, another WSPF nurse, Anderson, documented in Mr. Lockett's inmate medical records a recommendation from the treating emergency room physician that Mr. Lockett be given oxycodone, a stronger, immediate-release opioid, to treat his sickle cell pain. The entry in Mr. Lockett's chart originally instructed, "Please fill the Rx in the morning,"[5] but that note was crossed out. NP Bonson wrote, "Had one time dose Oxycodone 20mg from Hospital. Admin[istered] this AM."[6] She noted that "Mr. Lockett has been successfully managed" with Tylenol #3 and concluded "we will continue his Tylenol #3 … as ordered on 9/20/16 x

---

[4] *See generally* R.57-1.

[5] R.42-3 at 36.

[6] *Id.*

30 days."[7] In a subsequent explanation of her decision, NP Bonson stated that several factors led her to choose to continue with Tylenol #3 rather than the stronger opioid. She noted that Mr. Lockett's chronic symptoms had been managed successfully on the weaker drug prior to the crisis, that the stronger drug carried additional concerns for substance abuse, and that, in any event, long-term oxycodone use required approval from a WDOC committee, a process that would have taken time. Finally, she believed that the recommended dose itself was very high and, although appropriate to treat crisis pain, was not indicated for Mr. Lockett's chronic pain.

Two days after his return to WSPF, Mr. Lockett filed a health services request. He stated that he was in constant pain and asked why he was not receiving the medication prescribed by the emergency room physician. Nurse Edge responded to his request by noting that he *was* receiving pain medication, although it was the Tylenol #3 he had received in the prior month, not the oxycodone recommended by the external physician. Mr. Lockett responded on October 6 with an administrative complaint. He claimed that NP Bonson was denying him "the correct medication."[8] His complaint was rejected.

Just two days later, on October 8 and 9, Mr. Lockett refused his doses of Tylenol #3 during medication pass. Although the nurse "educated [him] about [the] importance of pain control and taking pain medication on [a] regular ba-

---

[7] *Id.*

[8] R.35-2 at 5.

sis," Mr. Lockett "reported he just didn't need the medication at that time."[9]

On November 11, Mr. Lockett did not receive his medication during two of his four daily medication passes. Four days later, he filed an administrative complaint against Nurse Edge for failing to deliver the medication. He claimed that he had asked WSPF staff to call for the medication, but because the call was not received until after the second missed pass, Nurse Edge informed him that he would have to wait for the third pass to receive the medication. After investigation, his complaint was dismissed. Mr. Lockett contends that he took a timely appeal of this dismissal by placing the appeal in an outgoing box, but also admits that he never received a receipt or a response. The record contains no copy of Mr. Lockett's appeal, and, according to the WDOC complaint examiner, the WDOC has no record of having received it.[10]

On November 17, Mr. Lockett requested to be seen by a nurse. During that visit, he reported "unbearable" pain and that the pain medication was not doing anything.[11] The nurse documented that Mr. Lockett declined his pain medication because it was ineffective. He was sent to the emergency room and treated. When he returned two days later, another WSPF nurse, Bethel, documented the treating physician's medication order for APAP, another form of aceta-

---

[9] R.42-3 at 17.

[10] R.35 at 3.

[11] R.42-3 at 15.

minophen, on a short-term basis, and a long-term change from acetaminophen with codeine to one with hydrocodone. NP Bonson countersigned, accepting the recommendation. She prescribed the new medication as recommended by the physician first for a one-week period, and then for a one-month period. Her follow-up notes indicate that Mr. Lockett reported that it was working well.

Just days later, however, he ran out of his supply of the hydrocodone. When he called for pain medication for the night, he was given tramadol by a separate on-call doctor, and a subsequent doctor switched him to Tylenol #3. When he filed a health services request with NP Bonson, she indicated that she had put in an order for his hydrocodone. Two weeks later, anticipating that he would run out over a holiday, he again filed a health services request with NP Bonson, who replied the same day that it would be refilled because she did not "want [him] to run out either!"[12]

**B.**

On May 17, 2017, Mr. Lockett initiated this action by filing a pro se complaint under 42 U.S.C. § 1983 against NP Bonson and Nurse Edge. He alleged that the defendants had acted with deliberate indifference in treating his sickle cell disease, in violation of the Eighth Amendment. His specific allegations with respect to NP Bonson included her failure to provide him with medication for several days from September 26 to October 3, 2016, and her decision to continue him with his regimen of Tylenol #3 following his October 3, 2016 hospitalization, when his treating physician recommended a

---

[12] *Id.* at 115.

stronger opioid. With respect to Nurse Edge, his allegations concerned the day on which he received no medication at the first two pass times and then had to wait until the next pass time to receive the medication.

Following discovery, the defendants moved for summary judgment, which the district court granted in full. Although it was undisputed that Mr. Lockett's sickle cell disease is a serious medical condition as contemplated by the Eighth Amendment, the court concluded that the evidence did not establish deliberate indifference on the part of either NP Bonson or Nurse Edge.

Addressing the claim, the court found that there was no evidence that NP Bonson was aware that Mr. Lockett had not been receiving his medication over the several-day period in September and October 2016. Therefore, she could not have known of a substantial risk of serious harm. With respect to her October 4, 2016 decision to continue treating Mr. Lockett with Tylenol #3, instead of the oxycodone, which had been recommended by the emergency room physician, the court determined that her decision "was a justified exercise of professional judgment given the information before her."[13] The court found that NP Bonson "based her decision on Lockett's medical record and history, her concern about opioid use and substance abuse in prison, the high amount of Oxycodone prescribed, and the fact that prior to the October incident, Lockett's long-term pain appeared to have been successfully managed by the Tylenol

---

[13] R.63 at 10.

#3."[14] The court also found that Mr. Lockett's assertion that he had notified NP Bonson on September 7, 2016, that the Tylenol #3 was not helping his pain was "not supported by the record."[15] Further, even if this allegation were true, her decision did not constitute deliberate indifference because Mr. Lockett had made no other complaint over a month-long period, "indicating that the Tylenol #3 was sufficient to treat his long-term pain."[16] Therefore, the court ruled, NP Bonson was entitled to summary judgment.

Turning to Mr. Lockett's claim against Nurse Edge and her delay in providing him with medication in November 2016, the district court found that he had failed to exhaust his administrative remedies within the WDOC. Mr. Lockett asserted that he had filed a timely appeal from the Reviewing Authority's decision but never had received a response. However, he presented no evidence of the Corrections Complaint Examiner's receipt of his appeal. Because the WDOC rules provide that the Corrections Complaint Examiner "shall, within 5 working days after receiving an appeal, issue a written receipt of the appeal to the inmate," Wis. Admin. Code DOC § 310.13(4), the court ruled that, "[a]bsent a receipt, … an inmate's administrative remedies are not considered exhausted."[17] The court therefore granted summary judgment to Nurse Edge without considering the

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.* at 14–15.

merits of Mr. Lockett's Eighth Amendment claim against her.

## II.

## DISCUSSION

We review the district court's decision to grant the defendants' motion for summary judgment de novo. *Witham v. Whiting Corp.*, 975 F.2d 1342, 1345 (7th Cir. 1992). We view the record and draw all reasonable inferences from it in the light most favorable to Mr. Lockett, the nonmoving party. *Dunigan ex rel. Nyman v. Winnebago Cty.*, 165 F.3d 587, 590 (7th Cir. 1999). We will affirm the judgment if there is no genuine dispute of material fact and if the defendants are entitled to judgment as a matter of law. *Bailor v. Salvation Army*, 51 F.3d 678, 681 (7th Cir. 1995).

Mr. Lockett challenges the district court's resolution of only two of his Eighth Amendment claims. First, with respect to NP Bonson, he contends that the district court erred in concluding that, as a matter of law, she did not act with deliberate indifference to his medical needs in rejecting the physician's recommendation to increase his pain medication and in choosing instead to continue him on his prior course of Tylenol #3. With respect to Nurse Edge, Mr. Lockett maintains that the district court erred in concluding that he had failed to exhaust his administrative remedies.[18] We address each of these contentions in turn.

---

[18] Mr. Lockett has abandoned any argument concerning the failure to provide him with medication in late September and early October 2016, prior to his hospitalization.

**A.**

We begin with the claim that NP Bonson acted with deliberate indifference in treating Mr. Lockett's pain when he returned from the emergency room on October 4, 2016.

The Eighth Amendment's prohibition on cruel and unusual punishment "protects prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain,'" including "grossly inadequate medical care." *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). To prevail on a claim based on deficient medical care, the plaintiff "must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). The first element, an objectively serious medical condition, is satisfied if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles*, 771 F.3d at 409; *see also Gutierrez v. Peters*, 111 F.3d 1364, 1370–73 (7th Cir. 1997). The district court found, and the parties do not dispute, that Mr. Lockett's sickle cell disease is a serious medical condition. Therefore, we focus on the second element: whether NP Bonson acted with deliberate indifference.

"Deliberate indifference is a subjective standard." *Arnett*, 658 F.3d at 751. To be found liable under the Eighth Amendment, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) ("[T]he Supreme Court has instructed us that a plaintiff must

provide evidence that an official *actually* knew of and disregarded a substantial risk of harm."). Whether a prison official acted with the requisite state of mind "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. In making this assessment, "we must examine the totality of an inmate's medical care." *Dunigan*, 165 F.3d at 591 (quoting *Gutierrez*, 111 F.3d at 1375). The standard is a rigorous one. To establish the requisite mental state, our cases make clear that "[s]omething more than negligence or even malpractice is required." *Pyles*, 771 F.3d at 409; *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Within the universe of deliberate indifference cases is a narrower category when a prisoner alleges not that his condition was ignored entirely, but that he received constitutionally deficient treatment for the condition. We have clarified that these cases are better framed "not [as] deliberate indifference to a serious medical need," but as a challenge to "a deliberate decision by a doctor to treat a medical need in a particular manner." *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). In such cases, we defer to a medical professional's treatment decision "unless 'no minimally competent professional would have so responded under those circumstances.'" *Pyles*, 771 F.3d at 409 (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). A "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* Our standard reflects the reality that there is no single "'proper' way to practice medicine in a prison, but ra-

ther a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Nevertheless,

> "where evidence exists that the defendant[] knew better than to make the medical decision[] that [he] did," then summary judgment is improper and the claim should be submitted to a jury. State-of-mind evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment; the defendant's persistence in "a course of treatment known to be ineffective"; or proof that the defendant's treatment decision departed so radically from "accepted professional judgment, practice, or standards" that a jury may reasonably infer that the decision was not based on professional judgment.

*Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016) (alterations in original) (citations omitted) (quoting *Petties*, 836 F.3d at 730–31). A medical professional's choice to pursue an "'easier and less efficacious treatment'" or "a non-trivial delay in treating serious pain" may also support a claim of deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (quoting *Estelle*, 429 U.S. at 104 & n.10).

We routinely have rejected claims, however, where a prisoner's claim is based on a preference for one medication over another unless there is evidence of a *substantial* departure from acceptable professional judgment. Pointedly, in *Burton v. Downey*, 805 F.3d 776, 785–86 (7th Cir. 2015), we considered a claim by a detainee who had requested narcotic

medication to address his pain after surgery. Prison staff prescribed a non-narcotic pain medication, even though a primary care physician outside of prison previously had prescribed a narcotic. Prison staff noted that the synthetic opiate that they administered had "less addictive potential" than the primary care physician's stronger method of pain relief. *Id.* at 786. The fact that the physician outside of prison had prescribed another medication merely demonstrated "that another doctor would have followed a different course of treatment," which was "insufficient to sustain a deliberate indifference claim." *Id.* To meet such a standard, we reiterated, required evidence of a "substantial departure from accepted professional judgment." *Id.* at 785 (quoting *Jackson*, 541 F.3d at 697). The decision to prescribe non-narcotic pain medication was within the bounds of professional judgment. *Id.* at 785–86; *see also Snipes*, 95 F.3d at 591 (noting that "[t]he administration of pain killers requires medical expertise and judgment" and that their use "entails risks that doctors must consider in light of the benefits").

The record before us demonstrates that NP Bonson employed professional judgment in her treatment of Mr. Lockett's sickle cell disease, both in the long term and in her specific response to his October 2016 sickle cell crisis. As required by WSPF protocol, the prison sent Mr. Lockett to the local emergency room for treatment of a sickle cell crisis. Although the external treating physician recommended that Mr. Lockett take oxycodone, NP Bonson elected to use a different pharmaceutical. She noted that Mr. Lockett "[h]ad [a] one time dose [of] Oxycodone 20mg from Hospital," but she discontinued that medication and returned him to his prior

course of Tylenol #3.[19] She noted in the chart that Tylenol #3 had successfully managed his chronic pain.

Mr. Lockett submits that NP Bonson's decision to "overrule[]" the non-prison doctor and to deny him the medication that he requested "displayed knowing disregard for his suffering."[20] It is firmly established, however, that mere "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles*, 771 F.3d at 409; *see also Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003); *Snipes*, 95 F.3d at 591. With respect to pain control specifically, our cases recognize that these are matters that require the application of "medical expertise and judgment." *Snipes*, 95 F.3d at 591. All we have here is NP Bonson's "deliberate decision," based on a professional assessment, to treat Mr. Lockett's sickle cell pain using Tylenol #3 instead of oxycodone. *Id.* That decision cannot support an Eighth Amendment violation. As in *Burton*, the record, taken as a whole, demonstrates that NP Bonson clearly exercised her medical judgment in making her treatment decision. Far from being indifferent to his pain, NP Bonson had increased the strength of his pain medication during the month before his sickle cell crisis. In the weeks before the crisis, there were occasions when Mr. Lockett refused his medication as unnecessary and other occasions where he did not receive it and did not file a complaint or otherwise notify her. His medical records

---

[19] R.42-3 at 36.

[20] Appellant's Br. 14–15.

indicated that Tylenol #3 was sufficient to handle his chronic, non-crisis sickle cell pain.[21] NP Bonson also considered Mr. Lockett's medical history including his own history of substance abuse, the risks associated with opioid use and substance abuse in prison, and the high amount of oxycodone prescribed.

Moreover, the totality of NP Bonson's care demonstrates affirmatively that she was "continually solicitous of" and "responsive to" Mr. Lockett's medical needs. *Dunigan*, 165 F.3d at 592. She promptly responded to Mr. Lockett's health services requests and timely filled and renewed his prescriptions during the relevant time frame. The district court correctly concluded that no reasonable jury could have found that NP Bonson acted with deliberate indifference in treating Mr. Lockett's sickle cell disease. The district court properly granted summary judgment in her favor.

## B.

Mr. Lockett also asks that we review his contention that Nurse Edge violated the Eighth Amendment when she told him that he would have to wait until the next pass to receive his medication, even though he had not received it on the

---

[21] Mr. Lockett maintains that he told the health services unit that Tylenol #3 was insufficient to manage his pain on September 7, 2016. That claim is undercut by the medical records of that visit, which do not discuss pain management at all. However, even if Mr. Lockett *did* make that claim on September 7, the fact remains that he demanded no other pain medication in the month of September and did not even complain when doses were not received. In short, NP Bonson's belief that Tylenol #3 was working to control chronic pain was not unreasonable given Mr. Lockett's own undisputed course of conduct at the time.

two earlier consecutive passes. The district court entered summary judgment for Nurse Edge on this claim, concluding that Mr. Lockett had failed to exhaust his administrative remedies. Mr. Lockett submits he did everything required under the WDOC's rules to exhaust those remedies and therefore had the right to present them to the district court.

The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions" under 42 U.S.C. § 1983, "or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This provision requires that, "[t]o exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). We "take[] a strict compliance approach to exhaustion." *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). Failure to exhaust "is an affirmative defense, and the burden of proof is on the defendant[]." *Id.*

There is no dispute that Mr. Lockett initially took the required steps under the Wisconsin Administrative Code to file his complaint. The dispute centers on whether Mr. Lockett took an appeal from the denial of that initial complaint. Mr. Lockett claims that he did;[22] in response, Nurse Edge provided the affidavit of Ellen Ray, an Institution Complaint Examiner and Litigation Coordinator at WSPF, who stated that the facility has no record that Mr. Lockett ever appealed the denial of this complaint against Nurse Edge. Ray includ-

---

[22] R.37 (Lockett Aff.).

ed with her declaration the complaint packet; that packet includes no appeal.

In *Dole v. Chandler*, 438 F.3d 804 (7th Cir. 2006), we considered whether an Illinois prisoner had exhausted his administrative remedies. Dole claimed to have filed a complaint using the appropriate prison guidelines and to have retained a full handwritten copy for himself to guard against the consequences of the original being lost. He placed his complaint in outgoing mail, and the parties did not dispute that it was picked up by a guard and should have been considered mailed. Dole received no response to his complaint, however, and by the time he inquired, the deadline for filing had passed. Dole asked us to deem his claim exhausted, although prison authorities had no record of having received it, let alone of having reviewed it on the merits. We concluded that, under the circumstances, Dole "had done all that was reasonable to exhaust his administrative remedies." *Id.* at 812. In our opinion, we addressed the district court's concern that siding with Dole meant that "all prison inmates could henceforth avoid the PLRA's exhaustion requirement simply by claiming that they mailed a letter." *Id.* We observed, however, that Dole had produced *undisputed* evidence that his complaint had been taken by a prison guard in due course. *Id.*; *see also id.* at 811. Furthermore, we noted that "future false claims can be minimized by setting up a receipt system for prison mail." *Id.* at 812.

Wisconsin has such a system.[23] The applicable regulations mandate that the prisoner receive a receipt for a complaint: A Corrections Complaint Examiner "shall, within 5 working days after receiving an appeal, issue a written receipt of the appeal to the inmate." Wis. Admin. Code DOC § 310.13(4). This receipt plays a very significant role in the complaint process and, indeed, in Mr. Lockett's ability to preserve his right to initiate litigation in the district court if the prison system fails to resolve the complaint within the time prescribed by the regulations. The regulations specifically provide that if a prisoner does not receive an answer to his appeal within 45 days of his receiving the receipt of fil-

---

[23] Under the applicable rules, Wis. Admin. Code DOC § 310 (2016), the process begins when an inmate files a complaint "within 14 calendar days after the occurrence giving rise to the complaint." *Id.* § 310.09(6). A complaint is "filed" when it is "deposit[ed] … in a locked box designated for complaints" or "submitt[ed] … to the office of the ICE [Institution Complaint Examiner] via institution mail." *Id.* § 310.09(8). The Rules provide that ICE staff shall collect complaints and "assign each complaint a file number, classification code, and date for purposes of identification." *Id.* § 310.11(1), (2).

Following a review and investigation of the complaint, the ICE either rejects the complaint or sends a recommendation for further action to the Reviewing Authority. *See id.* § 310.11(11). The Reviewing Authority can dismiss, affirm, or return the complaint to the ICE for further investigation. *See id.* § 310.12. To appeal the Reviewing Authority's decision, a complainant must file a written request for review "within 10 calendar days after the date of the decision." *Id.* § 310.13(1). A Corrections Complaint Examiner "shall, within 5 working days after receiving an appeal, issue a written receipt of the appeal to the inmate." *Id.* § 310.13(4).

ing, he should deem the appeal denied and is free to initiate suit in the district court.[24]

As we emphasized in *Kaba v. Stepp*, 458 F.3d 678, 685 (7th Cir. 2006), when prison officials deny a prisoner the tools necessary to utilize an established complaint system, they place themselves in a position to exploit, for their own advantage, the exhaustion requirement of 42 U.S.C. § 1997e(a). Depriving a prisoner of such an important document is certainly the sort of deprivation that justifies his use of the complaint system. The receipt permits him to file in federal court if the prison system ignores his administrative appeal. There is certainly nothing in WDOC's complaint procedure that precludes such a use of the complaint procedure. Indeed, the regulations say explicitly that a prisoner must have an opportunity to seek information about the operation of the complaint system.[25]

---

[24] The timeline for resolution of appeals is as follows: Within "35 working days of receipt of the appeal," the Corrections Complaint Examiner shall recommend a decision to the Secretary of the WDOC. *Id.* § 310.13(6). The Secretary shall make a decision within "10 working days following receipt" of that recommendation. *Id.* § 310.14(1). "If the inmate does not receive the [S]ecretary's written decision within 45 working days of the [Corrections Complaint Examiner]'s acknowledgment of receipt of the appeal, the inmate shall consider the administrative remedies to be exhausted." *Id.* § 310.14(3). The purpose of these rules is, inter alia, to allow inmates to raise complaints "in an orderly fashion," to "provide the department an early opportunity to decide the issue before an inmate commences a civil action," and to "encourage communication between inmates and staff." *Id.* § 310.01(2).

[25] Wis. Admin. Code DOC § 310.06.

Reading the regulations in their totality, we must conclude that Mr. Lockett was obliged to regard the absence of receipt as a red flag; he should have undertaken, through the complaint procedure, an inquiry to ascertain why he had not received this important document. Having failed to make that inquiry, he may not now counter evidence that the prison did not receive his administrative appeal with a bald assertion of a timely filing.[26]

We also note that requiring a prisoner in Mr. Lockett's position to employ the complaint system to ascertain the fate of his appeal and the receipt of filing is compatible with the primary purpose of the exhaustion doctrine: it alerts the prison officials to the existence of the problem and affords an opportunity to repair the injury. *Turley v. Rednour*, 729 F.3d 645, 649 (7th Cir. 2013). Moreover, it is a practice known to our case law. *Cf. Brengettcy v. Horton*, 423 F.3d 674, 678, 682 (7th Cir. 2005) (allowing a prisoner to file an action in the district court after seeking, through the prison grievance system, an explanation for an earlier grievance to which he had never received a reply); *Lewis v. Washington*, 300 F.3d 829, 831–32 (7th Cir. 2002) (plaintiff followed up with Internal Affairs Office and with the warden and filed multiple griev-

_____

[26] *See* R.63 at 14–15. We see no disagreement between our decision today and the decision of our colleagues in the Fifth Circuit in *Cowart v. Erwin*, 837 F.3d 444, 452 (5th Cir. 2016). In the Fifth Circuit's view, a prisoner had no obligation to "object in some way if they do not receive a timely interim reply" where the jail's policies "afforded Cowart no 'next step' once the response period for an interim reply had lapsed, but pending his receipt of a written answer with findings." *Id.* As we have pointed out in the text, the Wisconsin regulations clearly give the prisoner an established path for inquiry.

ances renewing his claims in the face of unanswered requests).

To be sure, the burden of proof on the exhaustion issue is on the defendants. *Kaba*, 458 F.3d at 681. Once the defendants asserted that defense through the affidavit and attached documentation of Ray, the Complaint Examiner, Mr. Lockett had to introduce sufficient evidence to demonstrate that there was a genuine issue of triable fact with respect to that defense. His own affidavit, while relevant and probative on the issues of whether he ever filed an appeal or received a receipt, is insufficient to establish that he ever exhausted the opportunity to resolve the matter within the prison system by making a reasonable inquiry into the reason for the absence of a receipt. In Wisconsin, the regulations clearly gave him an opportunity to do so, but there is no evidence that he availed himself of this tool.

Absent evidence that he attempted to avail himself of such a reasonable course, he has not fulfilled his obligation to support his affidavit's assertion that he filed the appeal. He does not have the receipt, and he has made no assertion that he ever made a reasonable inquiry as to why he never received one. Since the regulations clearly give him the path for making such an inquiry, he has not exhausted the available remedies. The district court committed no error in entering summary judgment to Nurse Edge on this count.

### Conclusion

Because the district court committed no error in resolving the deliberate indifference claims Mr. Lockett brought against NP Bonson and Nurse Edge, we affirm its judgment.

AFFIRM