SYKES, Circuit Judge.
While serving a probation-revocation sentence in an Illinois prison, Calvin Whiting fell ill with what turned out to be a rare form of non-Hodgkin’s lymphoma. A prison doctor initially diagnosed an infection and prescribed antibiotics and nonprescription pain relievers. It was not until two months later that the doctor ordered a biopsy and the cancer was discovered.
Whiting filed this lawsuit under 42 U.S.C. § 1983 against the prison doctor and the prison’s private medical provider alleging that they were deliberately indifferent to his serious medical needs during the two months that his cancer went undiagnosed. The district court granted summary judgment to both defendants. We affirm.
I. Background
Calvin Whiting violated the terms of his probation on an Illinois burglary conviction and was sent to the Shawnee Correctional Center 'in Vienna, Illinois, in July 2010. Wexford Health Sources, Inc., provides medical services for inmates in Illinois prisons. Dr. Alfonso David is the medical director at Shawnee. On October 15, 2010, Whiting went to the prison’s medical center seeking treatment for pain in his left jaw, left ear, and groin; he also discovered nodules developing in these areas. A nurse examined him and thought he had an ear infection; she gave him amoxicillin (an antibiotic) and Motrin.
About a week later Whiting returned to the medical center complaining that his pain had worsened and the amoxicillin had given him a rash. He was given Bactrim, a different antibiotic, instead. .Chest and abdominal x-rays also were ordered. Dr. David is listed as the prescribing physician for these orders, but it’s not entirely clear whether he or the nurse saw Whiting that day.
Over the next few days, Whiting told two different nurses that his pain and the bumps were getting worse. The nurses gave him Tylenol and scheduled an examination with Dr. David. On October 26 Whiting was sick enough to be admitted to the infirmary. Dr. David saw him the next day.
Dr. David’s observations from the October 27 examination indicate that Whiting’s pain was continuing (and possibly worsening), his lymph nodes were swollen, and he had developed a mass in his jaw. Dr. David ordered blood work and submitted a biopsy request to Wexford’s “Collegial Review Committee.” This “committee”—just Dr. David himself and one other physician— denied the biopsy request on November 1. The two doctors decided to try two different antibiotics (doxycyeline and Augmen-tin), one after the other, and proceed with a biopsy if this course of treatment did not work. Dr. David implemented this treatment plan that same day. Whiting continued to receive nonprescription pain medication.
The first few days on the new antibiotic regimen showed promise: Two nurses re *661 ported some improvement in Whiting’s condition. But by November 7 Whiting was reporting new bumps and increased pain. On November 29 a nurse observed many more bumps and scheduled another appointment with Dr. David. On December 2 Dr. David examined Whiting and resubmitted the biopsy request. It was approved four days later, and the biopsy was performed on December 21, almost two full months after Dr. David first submitted the biopsy request to the “committee.” The results revealed that Whiting had a rare type of non-Hodgkin’s lymphoma.
Dr. David referred Whiting to an outside oncologist, Dr. Mahnaz Lary, who diagnosed Stage IV SLK positive anaplastic large cell lymphoma, a rare and aggressive form of the disease. Chemotherapy began in early January 2011. In June 2011 Whiting’s lymphoma appeared to be in complete remission, but by August the disease had returned. Whiting began another round of chemotherapy. In October 2011 he was approved for a stem-cell transplant at Barnes Jewish Hospital in St. Louis. A scan in December 2011 showed the lymphoma again in remission.
Whiting’s prison sentence ended in January 2012. After his release he received additional chemotherapy and a stem-cell transplant at the University of Chicago Medical Center. A biopsy in June 2012 brought bad news: the lymphoma was back. Since then Whiting has been receiving palliative chemotherapy and remains a candidate for another stem-cell transplant.
Whiting filed this suit against Dr. David and Wexford alleging that they were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.[1] His claim focuses on the period from late October 2010, when Dr. David first examined him, and early January 2011, when chemotherapy began. Whiting argues that the decision to postpone the biopsy and continue to treat him for an infection forced him to endure severe pain during this two-month period.
Both defendants moved for summary judgment. Dr. David argued that the evidence was insufficient to support an inference that he acted with the necessary culpable state of mind. Wexford argued that Whiting failed to produce evidence showing that his injury was caused lay a policy or custom, a necessary element for liability under Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The district judge accepted these arguments and entered judgment for the defendants.
II. Discussion
We review the court’s order granting summary judgment de novo, viewing the evidence and drawing all reasonable inferences in Whiting’s favor. Burton v. Downey, 805 F.3d 776, 783 (7th Cir. 2015). Summary judgment is appropriate if “there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a). A factual dispute is “genuine” “if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
A. Dr. David
“[Djeliberate indifference to serious medical needs of prisoners constitutes the ‘unnecessary and wanton infliction of pain’ proscribed by the Eighth Amend *662 ment.” Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)) (citation omitted). To prevail on a deliberate-indifference claim, the plaintiff must prove that he suffered from “(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.” Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008). Lymphoma is an objectively serious medical condition, and Whiting submitted expert testimony that he would have suffered significantly less pain during November and December of 2010 if a biopsy had been ordered and chemotherapy begun. As in many deliberate-indifference cases, the dispute rests on the second element of the claim.
A prison official is deliberately indifferent only if he “knows of and disregards an excessive risk to inmate health or safety.” Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The state-of-mind element is measured subjectively: The defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference. Id.-, see also Petties v. Carter, No. 14-2674, 836 F.3d 722, 728, 2016 WL 4631679, at *3 (7th Cir. Aug. 25, 2016) (en banc) (“[T]he Supreme Court has instructed us that a plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm.”). The requirement of subjective awareness tethers the deliberate-indifference cause of action to the Eighth Amendment’s prohibition of cruel and unusual punishment; “an inadvertent failure to provide adequate medical care cannot be said to constitute ‘an unnecessary and wanton infliction of pain.’ ” Estelle, 429 U.S. at 105, 97 S.Ct. 285 (emphasis added).
When a prison medical professional is accused of providing inadequate treatment (in contrast to no treatment), evaluating the subjective state-of-mind element can be difficult. It’s clear that evidence of medical negligence is not enough to prove deliberate indifference. Id. at 106, 97 S.Ct. 285 (“Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.”); Petties, 836 F.3d at 728, 2016 WL 4631679, at *3 (“[Plaintiffs must show more than mere evidence of malpractice to prove deliberate indifference.”); see also McGee v. Adams, 721 F.3d 474, 481 (7th Cir. 2013); Duckworth, 532 F.3d at 679 (“Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts.”); Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005) (“[Neither medical malpractice nor a mere disagreement with a doctor’s medical judgment amounts to deliberate indifference.”). So without more, a mistake in professional judgment cannot be deliberate indifference.
By definition a treatment decision that’s based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.
Zaya v. Sood, No. 15-1470, 836 F.3d 800, 805-06, 2016 WL 4621045, at *3 (7th Cir. Sept. 6, 2016).
On the other hand, “where evidence exists that the defendant! ] knew better than to make the medical decision[ ] that [he] did,” then summary judgment is improper and the claim should be submit *663 ted to a jury. Petties, 836 F.3d at 730-31, 2016 WL 4631679, at *6. State-of-mind evidence sufficient to create a jury-question might include the obviousness of the risk from a particular course of medical treatment, id. at 730, 2016 WL 4631679 at *4; the defendant’s persistence in “a course of treatment known to be ineffective,” id.; or proof that the defendant’s treatment decision departed so radically from “accepted professional judgment, practice, or standards” that a jury may reasonably infer that the decision was not based on professional judgment, id. (quotation marks omitted).
,N° evidence in, this case supports an inference that Dr. David “knew better” than to pursue the course of treatment that he did. He explained in his deposition that although he considered the possibility of lymphoma, he thought "Whiting had an infection and treated him for that condition, putting off an invasive biopsy until it was clear that aggressive antibiotic treatment wasn’t working. "Whiting argues that Dr. David’s decision on November 1 to try two more antibiotics when the first two were ineffective is sufficient for a jury to infer that the doctor was deliberately indifferent. But no expert testified that Dr. David’s chosen course of treatment was a substantial departure from accepted medical judgment, and the decision was not so obviously wrong that a layperson could draw the required inference about the doctor’s state of mind without expert testimony.
Our decision in Duckworth is instructive on this point. There we confronted a claim that two prison physicians should have ordered a cystoscopy to rule out bladder cancer as soon as they noticed blood in the plaintiffs urine. The first physician didn’t suspect cancer; the second physician was aware of the cancer risk but thought that the plaintiff had another condition and pursued a course of treatment consistent with that diagnosis. 532 F.3d at 680-81. The plaintiff provided expert testimony from an experienced urologist that cancer should always be ruled out when a patient has blood in his urine. Id. at 681. We held that the expert’s testimony showed only “how a reasonable doctor would treat Duckworth’s symptoms, but it [did] not shed any light into [the defendant’s] state of mind.” Id. In other words, it “just ... reiterate[d] the standard for medical malpractice, which .falls short of deliberate indifference.” Id.
The evidence here falls even further short of what’s required. Whiting doesn’t have any expert testimony indicating that Dr. David’s infection diagnosis and concomitant treatment plan departed from accepted medical practice, much less substantially so.
Whiting compares his case to Hayes v. Snyder, 546 F.3d 516 (7th Cir. 2008), but the similarities are superficial. The prison physician in Hayes gave the plaintiff an antibiotic and Tylenol III for obvious and excruciatingly painful testicular cysts; he also refused to authorize a referral to a specialist. Unlike this case, the plaintiff in Hayes produced considerable evidence showing that the physician’s choice of treatment was not based on a mere mistake in professional judgment. For example, the physician—the medical director at the prison—acknowledged in his deposition that other prison doctors who saw the plaintiff ordered prescription-strength pain medication and a referral to a specialist. Id. at 524. The defendant’s approval was required before these steps could be taken, but he “refused to give that approval,” asserting an after-the-fact justification that he didn’t have the proper paperwork. Id. He also claimed, implausibly, that he “wouldn’t know which specialist to send [the plaintiff] to” without more clinical in *664 formation. Id. at 526. We concluded on these facts that the evidence was sufficient for a fact finder to conclude that the doctor was subjectively indifferent to the plaintiffs medical needs. Id.
Here, in contrast, the record contains no evidence from which a jury could infer that Dr. David was subjectively indifferent to Whiting’s condition—in short, that Dr. David knew that the additional antibiotics would be ineffectual but persisted in this course of treatment anyway. Without expert testimony a lay jury could not infer that because amoxicillin and Bactrim did not work, it was obvious to Dr. David that the doxycycline and Augmentin also would fail. To survive summary judgment Whiting needed to present evidence sufficient to show that Dr. David’s decision was “so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.” Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006). He did not do so. The district court properly granted summary judgment for Dr. David.
B. Wexford
Whiting’s claim against Wexford meets the same fate. Wexford is a private corporation, but we’ve held that the Mo-nell theory of municipal liability applies in § 1983 claims brought against private companies that act under color of state law. Shields v. Ill. Dept. of Corr., 746 F.3d 782 (7th Cir. 2014) (noting every circuit court that has addressed the issue has extended the Monell standard to private corporations acting under color of state law). To prevail on his Monell claim, Whiting needs to show that Wexford’s policy, practice, or custom, caused a constitutional violation, Thomas v. Cook Cty. Sheriffs Dep’t, 604 F.3d 293, 303 (7th Cir. 2009). This requirement can be satisfied by evidence that “an official with final policy-making authority” acted for the corporation. Id. That’s the theory Whiting invokes on appeal: He argues that Dr. David was a final policymaker for Wexford.
But Whiting’s filings in the district court weren’t entirely clear on this point, so the argument is probably waived. Everroad v. Scott Truck Sys., Inc., 604 F.3d 471, 480 (7th Cir. 2010). Waiver aside, the claim fails on the merits for two independent reasons.
First, Dr. David did not have final poli-cymaking authority in the relevant sense. He may have had the final say on Whiting’s treatment plan and thus was the final decision-maker with respect to his care, but that’s not nearly enough to show he was the final policymaker. See Valentino v. Village of South Chicago Heights, 575 F.3d 664, 675 (7th Cir. 2009) (noting difference between having decision-making authority for some decisions and having the responsibility “for establishing final government policy on a particular issue”).
Second, Whiting’s theory of Mo-nell liability is contingent on a finding that Dr. David, the ostensible final policymaker, was individually liable for deliberate indifference. Our decision in Thomas makes clear that Monell liability does not always require a finding of individual liability. 604 F.3d at 305. But if the plaintiffs theory of Monell liability rests entirely on individual liability, as Whiting’s does here, negating individual liability will automatically preclude a finding of Monell liability. Id.
AFFIRMED.

. The suit named other defendants as well, but Whiting did not pursue his claims against them.