In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1889

DONALD CHARLES WILSON,

*Plaintiff-Appellant*,

*v.*

LORI ADAMS, PATRICK MURPHY, and WISCONSIN DEPARTMENT
OF CORRECTIONS,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 14-cv-222 — **Barbara B. Crabb**, *Judge*.

ARGUED APRIL 19, 2018 — DECIDED AUGUST 23, 2018

Before RIPPLE, MANION, and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge*. Since entering the custody of the
Wisconsin Department of Corrections in 2009, Donald Wilson
has sought medical treatment for dementia and Alzheimer's
disease, neck and throat pain, and difficulty breathing and
swallowing. He alleges that medical staff at Oshkosh Correc-
tional Institution were deliberately indifferent in their treat-
ment of these ailments in violation of his Eighth Amendment

rights. The district court, however, found that no reasonable jury could find that the doctors were deliberately indifferent. We agree and affirm the grant of summary judgment in favor of the defendants.

## I.  BACKGROUND

Donald Wilson was incarcerated at the Oshkosh Correctional Institution in December 2009 after violating his parole. Shortly thereafter he sought treatment for cognitive problems as well as problems with his neck and throat.

Dr. Adams, a psychology supervisor at Oshkosh, first reviewed Wilson's mental health records shortly after Wilson arrived. The records indicated that Wilson had been diagnosed with a possible cognitive disorder. Dr. Adams observed Wilson exhibit symptoms associated with cognitive disorders and referred him to a psychiatrist, Dr. Thompson. Initially, Dr. Thompson also observed Wilson to be disoriented and struggling with memory. Later that spring, however, after talking with other prison staff-members, she determined that Wilson was likely feigning his symptoms in the presence of medical staff. She reported this to Dr. Adams. Nevertheless, Dr. Adams sent Wilson to the Wisconsin Resource Center—a specialized mental health facility for prisoners—for testing and medical observation. While there, Wilson received a CT scan and counseling. After eight months of observation, no evidence of dementia or Alzheimer's was revealed, and Wilson was returned to Oshkosh. When asked about Wilson's diagnosis by another treating physician, Dr. Adams reported that she had seen no evidence of cognitive or memory deficiency.

During this time, Wilson also began to complain of neck and throat problems. He additionally reported experiencing dizziness, double vision, and breathing trouble. Dr. Murphy, Wilson's primary care provider at Oshkosh, coordinated with a number of different specialists at the University of Wisconsin Hospital over the course of several years to try to diagnose the problems and address Wilson's symptoms.

Initially, Dr. Murphy provided Wilson with naproxen for pain and ordered testing to determine whether the problems were caused by Wilson's thyroid. An endocrinologist eventually ruled that diagnosis out and instead thought Wilson might have laryngeal cancer or a hypopharyngeal lesion. Dr. Murphy scheduled an appointment with an otolaryngologist, prescribed Wilson an antibiotic and a soft diet to accommodate his trouble swallowing, and continued to provide naproxen for pain.

After two endoscopies, it was determined that hardware from an earlier spinal fusion surgery was likely the cause of Wilson's problems. Dr. Murphy referred Wilson to a surgeon to determine whether the hardware could be removed. Dr. Murphy also extended Wilson's soft diet indefinitely upon the recommendation of a speech pathologist who performed a swallow evaluation, and changed Wilson's pain management regime from naproxen to daily extra-strength acetaminophen.

In April 2013, a surgeon determined that the spinal fusion hardware could not be removed without a high risk of morbidity. When this was explained to Wilson, he requested a second opinion.

Throughout that spring, Wilson continued to seek treatment for pain. Dr. Murphy scheduled a tooth extraction, believing some of the pain was caused by decaying teeth. Initially, Wilson did not consent to the procedure. Another time the procedure could not be completed because Wilson's blood pressure was too high. Once the extraction was completed, however, the swelling in Wilson's neck subsided.

In May 2013, Wilson was taken to a hospital, where the doctors also indicated the hardware was likely the source of Wilson's pain. When Wilson returned from the hospital, Dr. Murphy prescribed an antibiotic and narcotic pain medication. Wilson was also provided with a wheelchair, an order that someone push the wheelchair, and six months' worth of a nutritional supplement to address his weight loss.

Wilson attended follow-up appointments at the University of Wisconsin Hospital in July 2014 and January 2015. Specialists there recommended a bronchoscopy, an airway exam, lab tests, a transthoracic echocardiogram, and a CT scan of Wilson's chest. Dr. Murphy ensured that all of the procedures were scheduled and performed.

In 2015, Wilson sought a court order obliging the defendants to transport him to the doctor of his choice for an evaluation regarding the spinal fusion hardware. The court granted the order, and Wilson was transported to see Dr. Kalmjit Paul. Dr. Paul requested that Dr. Murphy schedule Wilson for a series of tests, which he did. Dr. Paul reviewed the results with Wilson at a subsequent appointment and informed Wilson that he agreed that surgery would not improve his condition. Instead, he recommended conservative treatment. In a follow-up letter to Wilson's attorney, Dr. Paul explained that "conservative treatment" includes many different types of

treatment, including pain medication. He did not recommend any more specific type of treatment for Wilson.

Wilson sued Dr. Adams, Dr. Murphy, and the Wisconsin Department of Corrections for violating the Americans with Disabilities Act and the Rehabilitation Act and for violating his Eighth Amendment rights, on the basis that they had been deliberately indifferent to his medical needs. He also claims they were negligent under state law. The district court granted summary judgment for the defendants in full. Wilson does not appeal the entry of judgment on his Americans with Disabilities Act or Rehabilitation Act claims, but he does appeal the district court's dismissal of his Eighth Amendment claim and his state-law negligence claim.

## II.   ANALYSIS

We review the district court's grant of summary judgment *de novo*, construing all facts and reasonable inferences in the light most favorable to Wilson, the non-moving party. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). We will affirm if there are no genuine issues of material fact and the defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 54.

### A.  *Wilson's § 1983 deliberate indifference claims*

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661–62 (7th Cir. 2016) (alteration in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Wilson, seeking damages pursuant to 42 U.S.C § 1983, claims the medical staff at Oshkosh were deliberately indifferent to his medical needs. To prove such a claim, he

needed to establish that he suffered from "an objectively seri-
ous medical condition" and that the "defendant was deliber-
ately indifferent to that condition." *Petties v. Carter*, 836 F.3d
722, 728 (7th Cir. 2016). "To determine if a prison official acted
with deliberate indifference, we look into his or her subjective
state of mind." *Petties*, 836 F.3d at 728; *see Farmer v. Brennan*,
511 U.S. 825, 834 (1994). An official is deliberately indifferent
when he disregards a known condition that poses "an exces-
sive risk to inmate health or safety." *Dunigan v. Winnebago
County*, 165 F.3d 587, 590 (7th Cir. 1999); *see Farmer*, 511 U.S.
at 837; *Whiting*, 839 F.3d at 662. Mere negligence or malprac-
tice is insufficient. *Petties*, 836 F.3d at 728; *Whiting*, 839 F.3d at
662.

Wilson claims Dr. Adams was deliberately indifferent in
her treatment of Wilson's mental health and that Dr. Murphy
was deliberately indifferent in his treatment of Wilson's phys-
ical health. We review each claim in turn.

1. *Dr. Adams was not deliberately indifferent in her treatment of
   Wilson's mental health.*

Wilson claims Dr. Adams should have done more to treat
his Alzheimer's disease and dementia. But he has failed to
prove that he actually suffers from either condition. He relies
on the report of a psychologist who saw him in 2003 in re-
sponse to an application for disability benefits. The report in-
dicates he had some cognitive disorder. None of the testing
done at Oshkosh or at the Wisconsin Resource Center, how-
ever, provided any evidence that Wilson suffered from a cog-
nitive disorder. We recognize that these disorders are difficult
to identify and diagnose, but without such evidence, Wilson
cannot show that he suffered a serious medical condition, let

alone that Dr. Adams was indifferent in her treatment of that condition.

Furthermore, the record indicates Dr. Adams investigated Wilson's mental health condition. She referred him to a psychiatrist and sent him to a specialty center for extensive observation. She only refused to provide further treatment after these specialists reported that they were not diagnosing Wilson and that they were suspicious that he was feigning his symptoms when in the presence of medical professionals. There is nothing in the record that would allow a reasonable juror to find that Dr. Adams believed that Wilson suffered from Alzheimer's disease or dementia and refused to provide proper treatment. Therefore, the district court did not err when it granted summary judgment for the defendants on this claim.

2. *Dr. Murphy was not deliberately indifferent in his treatment of Wilson's physical health.*

Wilson also contends the district court should not have entered summary judgment on his claim that Dr. Murphy was deliberately indifferent in his treatment of Wilson's neck, back, and throat pain. The district court assumed for purposes of the summary judgment motion that this pain constitutes a serious medical condition, as do we. "[W]e look at the totality of [Wilson's] medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728.

The record is replete with evidence of Dr. Murphy's attempts to diagnose the source of Wilson's pain. He worked with endocrinologists, an otolaryngologist, a speech pathologist, a pulmonologist, a neurosurgeon, and a dentist.

He repeatedly coordinated with these specialists to schedule follow-up appointments, procedures, and tests. By the time Wilson brought this suit, the Department had also made arrangements for Wilson to receive a second opinion regarding the removal of his spinal fusion hardware from a doctor of his choosing, albeit after the court ordered the Department to do so.

Wilson's strongest argument is that Dr. Murphy was indifferent in his treatment of Wilson's pain while he underwent these attempts to diagnose the source of the pain. For most of the relevant time period, Dr. Murphy provided Wilson with naproxen. It is true that continuing the same treatment despite no results can constitute indifferent treatment, *Kelley v. McGinnis*, 899 F.2d 612, 616 (7th Cir. 1990), but Wilson makes no suggestion that Dr. Murphy was withholding another more effective available treatment option. Wilson presents no evidence tending to show this is a situation in which the medical professional "chooses an 'easier and less efficacious treatment' without exercising professional judgment." *Petties*, 836 F.3d at 730. Furthermore, Wilson saw a number of other medical professionals, and none suggested his pain management regime was insufficient. At most, Dr. Paul suggested there were a number of potential treatment options, but he did not indicate that the pain medication provided was insufficient or that some other treatment should be provided.

Wilson also asserts that Dr. Murphy failed to comply with the recommendation of a pulmonologist regarding numbness in Wilson's hand. The pulmonologist noted that Wilson "may need further evaluation with Neurology." (R. 62-1 at 108.) Dr. Murphy declined to schedule any such further evaluation. "A jury can infer conscious disregard of a risk from a defendant's

decision to ignore instructions from a specialist." *Zaya*, 836 F.3d at 806; *see Petties*, 836 F.3d at 729. But that does not mean that a doctor must always follow the recommendation of a specialist. *See Petties*, 836 F.3d at 729 ("[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim."); *Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008) ("A medical professional's treatment decisions will be accorded deference 'unless "no minimally competent professional would have so responded under those circumstances."'") (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). Dr. Murphy explained that he was aware of Wilson's hand condition before sending him to the pulmonologist, that Wilson had been examined by a neurologist earlier in the year, and that he decided the best course of action was to continue providing pain medication and monitoring the numbness in Wilson's hand. Wilson presents no evidence that this decision was "a substantial departure from accepted professional judgment, practice, or standards." *Sain*, 512 F.3d at 895 (quoting *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 988 (7th Cir. 1998)).

Finally, Wilson claims Dr. Murphy delayed an appointment for three-and-a-half months, despite Wilson's repeated requests for treatment. Delaying treatment, even if not life threatening, can be evidence of deliberate indifference. *Guttierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997); *see Petties*, 836 F.3d at 730; *Perez v. Fenoglio*, 792 F.3d 778, 777–78 (7th Cir. 2015). But delays can also be reasonable. *See Petties*, 836 F.3d at 730 (noting that delays are common in prison and that length of the delay, seriousness of the condition, and ease of providing treatment must be considered when evaluating

whether a delay is "tolerable"). The defendants assert that delays during that time were common because Dr. Murphy was the only physician treating more than two thousand inmates and he needed to prioritize his appointments. Furthermore, a plaintiff must prove the delay in treatment "exacerbated the injury or unnecessarily prolonged pain," *Petties*, 836 F.3d at 730–31, and Wilson is unable to identify any evidence that such resulted from the delay. *See Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009) (explaining that an Eighth Amendment claim based on delay will fail "unless the plaintiff introduces verifying medical evidence that shows his condition worsened because of the delay").

No reasonable jury could find that Dr. Murphy was deliberately indifferent in his treatment of Wilson's physical health—either in seeking a diagnosis or in treating Wilson's symptoms. The district court did not err when it entered summary judgment for the defendants on this claim.

B.  *Wilson's state-law negligence claim*

 Wilson also claims the defendants were negligent in their treatment of his healthcare. This is a state-law claim. The district court properly exercised its supplemental jurisdiction and considered the claim along with Wilson's federal-law claims. 28 U.S.C. § 1367; s*ee Hansen v. Bd. of Trs.*, 551 F.3d 599, 607 (7th Cir. 2008) (noting that "[t]he district court has broad discretion in deciding whether to retain supplemental claims").

Wisconsin law requires that an expert witness testify to establish the standard of care in a medical malpractice case, unless "the situation is one where the common knowledge of laymen affords a basis for finding negligence." *Christianson v.*

*Downs*, 279 N.W.2d 918, 921 (Wis. 1979); *see also Carney-Hayes v. Nw. Wis. Home Care, Inc.*, 699 N.W.2d 524, 537 (Wis. 2005). Wilson offered no expert medical testimony. On appeal, Wilson argues that expert testimony was not necessary in this case, or, alternatively, that the report from Dr. Paul should be treated as expert testimony.

Expert testimony was necessary in this case, because ordinary laymen would not know what medical treatment was necessary based on the symptoms Wilson presented. In fact, the evidence presented indicates that a team of well-qualified specialists struggled to identify the cause of Wilson's pain or to diagnose any cognitive functioning problem. And Dr. Paul's report is not sufficient for these purposes, because it does not include any opinion regarding the proper standard of care or whether Dr. Murphy had provided proper care. Without expert testimony, Wilson could not prove his claim. Therefore, the district court did not err when it entered summary judgment for the defendants on this claim.[*]

---

[*] We have in the past expressed doubt concerning the applicability of Wisconsin's expert-evidence rule in diversity cases. *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004). We need not resolve that issue here. We have observed that the federal rule ("no expert testimony is needed when the symptoms exhibited are not beyond a layperson's grasp") may be indistinguishable from the Wisconsin rule. See *Gil v. Reed*, 535 F.3d 551, 558 n.2 (7th Cir. 2008) (quoting *Gil*, 381 F.3d at 659). And under either rule, Wilson has not presented any evidence from which a jury could reasonably determine the defendants' conduct fell below the appropriate standard of care.

### III.  CONCLUSION

Because we conclude the grant of summary judgment was appropriate, we do not consider the defendants' arguments regarding qualified immunity.

The judgment of the district court is AFFIRMED.