In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 18-2456

DENNIS DAVIS,

*Plaintiff-Appellant,*

*v.*

FRANCIS KAYIRA,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 15-cv-3075-SLD — **Sara Darrow**, *Chief Judge*.

_____

ARGUED MARCH 25, 2019 — DECIDED SEPTEMBER 16, 2019

_____

Before WOOD, *Chief Judge*, and FLAUM and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Dennis Davis is an Illinois prisoner suffering from kidney disease. After receiving dialysis on a Saturday morning, he told a prison nurse that his mind was fuzzy and his body was weak. Both complaints were similar to side effects he had experienced in the past after dialysis. The nurse called Dr. Francis Kayira, the prison's medical director, who was on call. The doctor asked her whether

Davis had asymmetrical grip strength, facial droop, or was drooling—all classic signs of a stroke. When she said "no," Dr. Kayira determined that Davis was experiencing the same dialysis-related side effects as before rather than something more serious. He told the nurse to monitor the problem and call him if the symptoms got worse. Dr. Kayira didn't hear anything else for the rest of the weekend, but on Monday morning he examined Davis and discovered that he had in fact suffered a stroke.

Davis later sued Dr. Kayira, alleging that he acted with deliberate indifference to his medical needs in violation of the Eighth Amendment. Davis also raised a state-law medical-malpractice claim. The district court entered summary judgment for Dr. Kayira on both claims. The judge ruled that the deliberate-indifference claim failed because there is no evidence that Dr. Kayira was aware of symptoms suggesting that Davis was suffering a stroke. And the state-law claim failed because Davis lacked expert testimony about the appropriate standard of care. A magistrate judge had blocked Davis's sole expert because he wasn't disclosed in time, and Davis never objected to that ruling before the district court.

We affirm. Davis lacks evidence of deliberate indifference. And because he did not ask the district court to review the magistrate judge's exclusion of his expert, his state-law claim fails as well.

## I. Background

Davis is currently serving a prison sentence at the Graham Correctional Center in central Illinois. He has a history of diabetes, high blood pressure, and renal disease.

Davis's renal disease requires dialysis, a treatment he began in 1996 and continues to receive three times a week.

Davis received dialysis early on the morning of Saturday, June 21, 2014. He told a nurse almost immediately afterward that he was feeling weak. She observed a number of symptoms, including slurred speech, an inability to follow commands, weak hand grasps, and pupils that were pinpoint and nonreactive. At 5:45 a.m. she called Dr. Kayira, the medical director at Graham Correctional Center. Dr. Kayira was on call for the weekend, but he wasn't otherwise scheduled to return to the prison until Monday morning. The nurse told him about the complaints and mentioned that Davis had previously experienced similar symptoms after dialysis. That isn't surprising given that patients are often fatigued after dialysis because of fluid withdrawal. Dr. Kayira asked the nurse whether Davis had asymmetrical hand-grip strength, whether he was drooling, and whether his face was drooping. She said "no" to all three, which led Dr. Kayira to conclude that Davis wasn't having a stroke but was instead suffering the same dialysis-related side effects as before. Dr. Kayira directed the nurse to put Davis in the infirmary to be monitored more closely, and he told her to have the daytime nurse call back if symptoms worsened.

Over the weekend Davis's condition deteriorated. But while the medical staff reported its observations in a series of handwritten notes, there is no evidence that anyone notified Dr. Kayira. A medical technician wrote at 6 a.m. on Saturday that Davis was confused and his grip was weaker on one side than the other. The same note mentioned that Dr. Kayira had asked for the daytime nurse to evaluate the patient and call him back, but it did not say whether

Dr. Kayira was told about the asymmetry. According to another note—written at an unknown time—Davis said that his left arm and leg weren't working and he thought he was having a stroke. A note written at 8 a.m. on Sunday said that Davis couldn't move one of his legs as much as normal. A note written at 3:30 p.m. the same day observed that Davis was weak in his left hand and leg but that he could raise his arms and sit up in bed. Notes the following morning continued to record weakness on Davis's left side. Again, none of the notes indicated that Dr. Kayira was notified of these changes in Davis's condition.

When Dr. Kayira examined Davis in person on Monday, he immediately recognized that Davis's strength was asymmetrical and he had likely suffered a stroke. Dr. Kayira transferred Davis to a hospital where the stroke was confirmed.

The following year Davis sued Dr. Kayira under 42 U.S.C. § 1983 alleging that he acted with deliberate indifference to his medical condition in violation of his Eighth Amendment right to be free from cruel and unusual punishment. He later amended his complaint to add a state-law medical-malpractice claim. Dr. Kayira was the only named defendant. More than a year into the litigation, Davis sought leave to amend his complaint again to add five nurses. The judge denied the motion because it was untimely and would cause undue prejudice and delay.

After filing suit, Davis obtained a report from a board-certified physician stating that his claim had merit, a prerequisite for the medical-malpractice claim under state law, which requires a plaintiff to obtain a certificate of merit at the pleading stage. *See* 735 Ill. Comp. Stat. 5/2-622 (2015).

The report concluded that "Dr. Kayira knew or should have known that Dennis Davis was suffering from a stroke, or that a stroke was imminent." But the report is unsigned and its author remains unidentified.

Once discovery began, the district judge adopted the parties' proposed pretrial schedule, which required that Davis disclose experts by June 1, 2017. All discovery was to close on October 1, 2017, but in November Dr. Kayira moved to extend the deadline. The judge granted the motion but rejected the parties' new proposed schedule, reasoning that it would delay trial until four years after the initial filing. Rather than adopt another phased schedule, she simply ordered that all discovery be completed by February 15, 2018. Six weeks before that deadline, she referred the case to a magistrate judge to handle the remaining pretrial matters.

Davis retained Dr. Coleman Seskind as an expert but didn't disclose the doctor's report until February 13, 2018—just two days before the final discovery cutoff. Dr. Kayira moved to strike the expert report as untimely. In a telephonic hearing, the magistrate judge explained that all discovery had to end by February 15 under the district court's order, which meant that Davis had left Dr. Kayira no opportunity to depose Dr. Seskind or otherwise respond to his proposed testimony. The magistrate judge concluded that it would be improper to allow Dr. Seskind to testify without that opportunity, so he granted the motion to strike.

Dr. Kayira then moved for summary judgment on both claims. The district judge granted the motion. She first concluded that the evidence was insufficient to establish that Dr. Kayira acted with deliberate indifference to Davis's medical condition. More specifically, no jury could find that

Dr. Kayira was aware based on the initial phone call that Davis was having a stroke. Moreover, there was no evidence that Dr. Kayira learned anything new until he arrived at the prison on Monday, at which point he immediately transferred Davis to the hospital. And Davis's state-law claim failed because he had no expert testimony on the appropriate standard of care. Davis never argued to the district judge that the magistrate judge was wrong to exclude Dr. Seskind's testimony.

## II. Discussion

"We review the court's order granting summary judgment de novo, viewing the evidence and drawing all reasonable inferences in" the nonmovant's favor. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661 (7th Cir. 2016). Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Whiting*, 839 F.3d at 661 (quotation marks omitted).

### A. The Eighth Amendment Claim

The Eighth Amendment requires that the government provide "medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). But a claim for violation of this right is not synonymous with a claim for medical negligence. To prevail on a claim that a prison healthcare provider violated the Eighth Amendment, a plaintiff must prove that he "suffered from an objectively serious medical condition" and the defendant was "deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d

722, 727–28 (7th Cir. 2016). Everyone agrees that Davis's stroke was an objectively serious medical condition. The only dispute is whether Dr. Kayira acted with deliberate indifference.

The deliberate-indifference standard requires a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A healthcare provider cannot be liable unless he "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. This is "essentially a criminal recklessness standard." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013). Indeed, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (quotation marks omitted).

When a plaintiff alleges that a healthcare provider knew enough to infer a substantial risk of harm, he must prove (1) that the provider was aware of facts supporting the inference and (2) that the provider *actually drew* the inference. *See Farmer*, 511 U.S. at 837. To prove the subjective component of the claim, a plaintiff might point to a number of things, including "the obviousness of the risk," "the defendant's persistence in a course of treatment known to be ineffective," or "proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice, or standards that a jury may reasonably infer that the decision was not based on professional judgment." *Whiting*, 839 F.3d at 663 (quotation marks omitted).

Davis claims that Dr. Kayira should have inferred that he was having a stroke based on the information in the initial phone call on Saturday morning. But there is no evidence

that the information relayed to Dr. Kayira at that time would have led every minimally competent doctor to conclude that Davis was at risk of something that serious. The fatigue Davis experienced is common in dialysis patients. Even more important, Davis himself had experienced similar side effects following previous dialysis treatment. And when Dr. Kayira asked the nurse whether Davis was showing telltale signs of a stroke, she said "no." Based on the then-available information, Dr. Kayira reasonably concluded that Davis was not suffering a stroke. At the very least, there is no evidence that Dr. Kayira actually drew the necessary inference—in other words, that he actually believed Davis had suffered a stroke.

We addressed essentially the same issue in *Whiting*. The doctor there thought it possible a patient had lymphoma but concluded it was more likely he had an infection. *See id.* Like Dr. Kayira, that doctor was wrong. We nonetheless held that a reasonable jury could not conclude that the doctor acted with deliberate indifference because no evidence suggested that he knew his diagnosis was wrong or that the treatment he prescribed would be ineffective. *See id.* at 664. We emphasized that there was no expert testimony suggesting the doctor's actions were a substantial departure from the norm. *See id.* This case is exactly the same. Dr. Kayira thought one diagnosis was far more likely than another and responded accordingly. There is no evidence—and certainly no expert testimony—to suggest he clearly should have known better.

In response Davis directs us to *Conley v. Birch*, where we held that a jury could find a doctor deliberately indifferent for failing to order an x-ray in response to a nurse's call about an inmate's serious hand injury. *See* 796 F.3d 742, 747–

49 (7th Cir. 2015). But there the evidence was sufficient to conclude that the nurse gave the doctor enough information to make it obvious that the hand was fractured and that an x-ray was needed. The record showed that the nurse likely told the doctor that the inmate's hand was swelling two days after the injury, that he had lost function in all five fingers, and that the hand was discolored. *See id.* at 744–45. In fact, the record was sufficient for a jury to find that the nurse *directly* told the doctor that he thought the hand was broken. *See id.* In Davis's case the cause of his symptoms wasn't similarly obvious and there is no reason to think Dr. Kayira's diagnosis was unreasonable, much less substantially so.

Of course, this might be a different case if Dr. Kayira had learned new information over the weekend about Davis's status. But there is no evidence that Dr. Kayira received any updates until he returned Monday morning. The record includes medical notes describing in detail how Davis's condition worsened, but no evidence suggests that Dr. Kayira was made aware of this information. Davis's best evidence is the note written by the medical technician at 6 a.m. on Saturday morning. It says that Davis's grip was asymmetrical and also records Dr. Kayira's order to watch Davis and have the daytime nurse call him back. But the note says nothing about whether the technician called Dr. Kayira to tell him about the asymmetry. Instead, the technician simply recorded what he personally observed while simultaneously noting Dr. Kayira's earlier order from the initial phone conversation during which the doctor was definitively told there was no asymmetry.[1]

_____

[1] At times Davis seems to suggest that Dr. Kayira conceded in his deposition that the technician told him about the asymmetry. As Davis

Davis offers no evidence that Dr. Kayira knew more. He argues that the nurses and the technician *might* testify at trial that they called Dr. Kayira a second time to relay new information. But without evidence that they *would* so testify (say, an affidavit or a deposition), Davis cannot survive summary judgment. Based on the information from the initial (and only) phone call, Dr. Kayira thought Davis was experiencing normal side effects of dialysis. His response—ordering closer monitoring and asking that he be notified of adverse changes—was not reckless. Granted, there is some evidence that he said he would call back later to check in. But at best that's probative of negligence. Without expert testimony establishing that every minimally competent doctor would have done so, that fact alone isn't enough to prove deliberate indifference. We therefore affirm the summary judgment on Davis's Eighth Amendment claim.

## B. The Medical-Malpractice Claim

Under Illinois law a medical-malpractice claim requires expert testimony about the appropriate standard of care "[u]nless the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson." *Sullivan v. Edward Hosp.*, 806 N.E.2d 645, 653 (Ill. 2004) (quotation marks omitted). The magistrate judge excluded Davis's sole expert because his disclosure was untimely. Davis challenges that ruling on appeal.

---

tells it, Dr. Kayira chose not to rely on the technician's observation because he thought him incompetent. But that's a mischaracterization of what Dr. Kayira said. While he did say that he didn't think the technician was competent, he also said very clearly that he didn't recall ever speaking to him.

The problem is that Davis never objected to that ruling when he was before the district court. Rule 72(a) of the Federal Rules of Civil Procedure says that a party may object to a magistrate judge's ruling on a nondispositive pretrial matter within 14 days. The very next sentence says: "A party may not assign as error a defect in the order not timely objected to." FED. R. CIV. P. 72(a); *Flint v. City of Belvidere*, 791 F.3d 764, 769 (7th Cir. 2015) ("[The] failure to challenge a magistrate's pretrial ruling in the district court forfeits the right to attack it on appeal.").

In response Davis directs us to the local rules for the Central District of Illinois. He notes that the rule about objecting to nondispositive orders uses permissive rather than mandatory language. *See* C.D. ILL. L.R. 72.2(A) ("Appeal of Non-Dispositive Matters. Any party may appeal from any order of a magistrate judge within 14 days … ."). He contrasts that with the rule governing dispositive motions, which explicitly says that the failure to object counts as a waiver. *See id.* L.R. 72.2(B). Thus, he reasons, a party litigating in that particular court need only object to a ruling on a dispositive matter in order to preserve its argument for appeal. But given that Rule 72(a) requires an objection to nondispositive orders within 14 days and itself bars further review of untimely objections, there's no need for the local rules to parrot that mandate. Davis didn't object to the magistrate judge's exclusion of his expert within the timeframe required by Rule 72(a), so the issue is not properly before us.

Without expert testimony, Davis's malpractice claim cannot succeed. Other than Dr. Seskind, the only doctor to have expressed an opinion on the standard of care is the

doctor who wrote the certificate of merit. *See* 735 ILL. COMP. STAT. 5/2-622. But that report is unsigned and the doctor remains unidentified. To take a malpractice claim to trial, "[t]he proponent of an expert's testimony must lay a foundation which affirmatively establishes the expert's qualifications and competency to testify." *Weekly v. Solomon*, 510 N.E. 2d 152, 155 (Ill. App. Ct. 1987). Davis obviously can't lay that foundation without identifying who the doctor is. And without expert testimony, his malpractice claim fails.

AFFIRMED