**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted October 15, 2020[*]
Decided November 19, 2020

**Before**

JOEL M. FLAUM, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 19-3423

| | |
|---|---|
| MUSTAFA-EL K.A. AJALA, formerly known as DENNIS-EL JONES, *Plaintiff-Appellant*, | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | No. 16-cv-639-bbc |
| UNIVERSITY OF WISCONSIN HOSPITAL AND CLINICS, et al., *Defendants-Appellees*. | Barbara B. Crabb, *Judge*. |

**O R D E R**

Mustafa-El Ajala, a Wisconsin inmate, sued several doctors, alleging that their treatment of his urinary, kidney, and parathyroid conditions violated the Eighth Amendment and state malpractice law. The district court entered summary judgment

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

for the defendants. Because no reasonable juror could conclude that the doctors were negligent or constitutionally deficient in their responses to Ajala's symptoms, we affirm.

From 2001 to 2010, Ajala experienced frequent, sometimes painful urination and above-average calcium in his blood. A test in 2001 first revealed his high calcium, a condition that can (but does not always) cause kidney stones and signal a problem in the parathyroid glands. Although the record contains no medical records from before 2007, Ajala attested that in 2003, he sought treatment from Dr. Burton Cox, a doctor at Wisconsin Secure Program Facility where he was housed, but Dr. Cox did not prescribe any medication or diagnose him. Ajala was housed at a different prison from 2005 to 2007. When he returned, he continued to complain of the same symptoms.

In 2010, Dr. Cox referred Ajala to the urology clinic at the University of Wisconsin Hospital, where he was treated for urinary problems and asymptomatic kidney stones. Dr. Sutchin Patel, a specialist at the clinic, conducted a urinalysis, bladder scan, and cystoscopy of the bladder's lining, but the results were unremarkable. He suggested medication for an overactive bladder, and Dr. Cox ordered it. At a follow-up visit, Ajala complained of pain, and Dr. Patel ordered a CT scan, which showed small, asymptomatic kidney stones. Because Ajala denied past incontinence or stones, Dr. Patel concluded that they were side effects of the bladder medication and suggested an extended-release version with fewer side effects. He also recommended decreasing salt intake and increasing citrates by drinking lime juice or lemonade. After the visit, Dr. Cox did not prescribe an oral citrate tablet. He attested that he thought Ajala could get lemonade from the canteen; Ajala says he told him that he could not.

The next year, Ajala's calcium and hormone levels remained steady, but his kidney stones worsened. Dr. Cox tested the calcium and parathyroid hormones in Ajala's blood three times: The results showed moderately high calcium levels on the first test and mildly high levels on the second and third. Each test showed normal levels of parathyroid hormone. Soon after, however, Ajala developed new kidney stones, some of which caused blockage and blood in his urine. He was rushed to the emergency room, given pain medication, and told to pass the stones.

In 2012, Ajala began seeing another specialist at the clinic, Dr. Srihavan Sivalingam. During their first visit, Ajala reported that the extended-release medication was helping, but not resolving, his frequent urination. A urinalysis showed normal results, and Dr. Sivalingam recommended taking the bladder medicine daily instead of as needed and ordered tests to look for kidney imbalances. Dr. Patel conducted the tests

and diagnosed "mild hypercalcemia," which he said does not require treatment when, as in Ajala's case, urine flow is good and the bladder empties well. He ordered a follow-up in a year and, in the interim, an x-ray to monitor potential stones.

Shortly after, a CT scan revealed three more kidney stones. When the stones became painful, Dr. Cox ordered that Ajala receive lemon juice every day. The lemon juice helped for a while until, in early 2013, the pain worsened. Lab tests around that time showed moderately high calcium levels and, for the first time, elevated levels of his parathyroid hormone. Dr. Cox referred Ajala back to the clinic, where Dr. Sivalingam diagnosed "possible hyperparathyroidism" and found multiple stones, which he extracted. After the surgery, he prescribed Ajala a narcotic pain medication.

Dr. Cox later discontinued the narcotic with three days left on the prescription because Ajala refused to lift his tongue to show that he had swallowed his pills, and two pills were found in his cell. Dr. Cox ordered a non-narcotic pain medication instead. He prescribed a narcotic again ten days later when Ajala had another surgery.

Finally, in late 2013, a third doctor at the clinic diagnosed Ajala with "primary parathyroidism" and removed part of his parathyroid, a surgery which resolved all Ajala's symptoms, including his urinary problems, kidney stones, and calcium levels.

In September 2016, Ajala sued Dr. Cox, Dr. Patel, and Dr. Sivalingam, alleging that their failure to diagnose and treat his underlying condition of hyperparathyroidism violated the Eighth Amendment, *see* 42 U.S.C. § 1983, and was negligent under Wisconsin law. He alleged that Dr. Cox further violated the Eighth Amendment when he discontinued his prescription narcotic. Ajala also sued the University of Wisconsin Hospital and Clinics over the treatment he received from Dr. Patel and Dr. Sivalingam.

As the case progressed, the district court denied several of Ajala's motions, including three requests for recruited counsel. The court initially granted the first motion, but after more than a year of looking, it found no lawyer to take the case. Because Ajala by then had been transferred to Virginia, and it was "even less likely" to find counsel, the court stopped looking. It denied the two later motions because it had already exhausted its options and, it explained, Ajala is "an intelligent and experienced litigator" who understands the issues, communicates well, and is "much more capable than the average pro se litigant." Ajala alternatively moved for a court-appointed medical expert, but the district court denied those requests as premature. It explained that before the dispositive issues were presented through summary judgment briefing,

the court could not tell if "complex or specialized issues" justified an expert. Finally, Ajala moved for default judgment against the defendants as a sanction for lying under oath. The court denied the motion, concluding that there was no evidence the defendants had purposely lied in any of the declarations Ajala challenged.

Eventually, the defendants moved for summary judgment. They argued that Ajala could not prove the medical malpractice claims because he failed to furnish evidence from a medical expert as required by Wisconsin law. In response, Ajala argued that, for two reasons, his malpractice claims should survive despite the absence of expert testimony: first, a medical expert was not required because the negligence was obvious; and, second, the medical defendants' own testimony sufficed to establish the standard of care. He added that "if the Court is of the position that Ajala still needs to present his own medical expert, then the Court should appoint one" because "[i]t would be a grave injustice to permit the dismissal of his claims."

The district court granted the defendants' motions for summary judgment. It first concluded that any claims arising before 2010 were barred by the statute of limitations. Next, it determined that no reasonable juror could conclude that, after 2010, any doctor provided unconstitutional or negligent care for Ajala's conditions or post-surgical pain. It did not address Ajala's narrow request for an expert, but it did not rely on the absence of expert testimony in concluding that his malpractice claims failed; instead, it concluded that, given the doctors' attentive treatment, no reasonable jury could view their medical decisions as negligent. Further, the clinic could not be liable because Drs. Patel and Sivalingam were employees of the University of Wisconsin School of Medicine, not the clinic.

Ajala raises several issues on appeal. We start with his challenge to the entry of summary judgment for the doctors on his Eighth Amendment claims arising after 2010. To get past summary judgment on those claims, Ajala needed to supply evidence that would permit a jury to find that each doctor knew about and deliberately disregarded his serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). We review de novo. *See Petties*, 836 F.3d at 727.

We begin with Dr. Cox, the prison doctor, and we agree with the district court that no reasonable juror could find that he was deliberately indifferent to Ajala's medical conditions after 2010. Dr. Cox referred Ajala to three specialists at the urology clinic, monitored his calcium and parathyroid levels, ordered that Ajala receive lemon juice to help with stones, and sent him to the emergency room when those stones

worsened. That Ajala preferred Dr. Cox to focus on his calcium levels is not enough to show deliberate indifference. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Further, neither of Ajala's two examples of Dr. Cox's deliberate indifference amounts to a constitutional violation. First, Dr. Cox did not ignore the directions of a specialist, as Ajala contends, when he did not prescribe citrate after Dr. Patel recommended it in 2010: At that time, Dr. Patel suggested a change in diet—less salt and more citrates like lemonade—not an oral supplement. So, assuming that Dr. Cox knew that Ajala could not get lemonade from the canteen (as Ajala maintains), his decision not to prescribe a citrate tablet was insufficient to sustain a deliberate indifference claim. *See id.* Second, Ajala argues that Dr. Cox disregarded his pain when, after surgery, he discontinued the narcotic pain medication. "We routinely have rejected claims, however, where a prisoner's claim is based on a preference for one medication over another, unless there is a substantial departure from acceptable professional judgment." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019). The record shows no such departure here, especially when Dr. Cox changed the prescription just a few days before it was scheduled to expire and only after Ajala had been caught hiding pills. *See id.* (noting that administration of painkillers entails risks that doctors can consider with benefits). Further, when Ajala had surgery a few weeks later, Dr. Cox refilled the prescription, demonstrating that he no longer thought the non-narcotic medication would alleviate Ajala's pain. Thus, no reasonable juror could find that Dr. Cox acted outside of the bounds of his professional judgment. *See id.*

We also agree with the district court that no reasonable juror could conclude that Drs. Patel and Sivalingam, the clinic's specialists, deliberately disregarded Ajala's medical condition. To signify deliberate indifference, a treatment decision "must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). The record undisputedly shows, however, that the specialists' decisions were rooted in medical judgment. Dr. Patel prescribed medication for Ajala's urinary issues; ordered CT scans and a cystoscopy to look for causes; recommended monitoring and dietary changes to address small, asymptomatic kidney stones; and determined that Ajala's mild hypercalcemia (paired with good urine flow and bladder health) required only monitoring. Dr. Sivalingam, too, adjusted Ajala's bladder medication, ordered the tests that led to Ajala's diagnoses, monitored for stones, and extracted them when he thought it warranted. The "totality" of care by these doctors is inconsistent with deliberate indifference. *See Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018).

Nor could a reasonable juror conclude that the specialists' failure to diagnose Ajala's hyperparathyroidism earlier was reckless or worse. *See David v. Kayira*, 938 F.3d 910, 914–15 (7th Cir. 2019). Again, the doctors embarked on a course of treatment that they escalated as the condition persisted and that ultimately led to the tests revealing the cause of his symptoms. Ajala presented no evidence that his symptoms would have led any minimally competent doctor to diagnose hyperparathyroidism earlier. *See id.* at 915. Further, Ajala has no evidence of when he developed the condition. His supposition that he had it all along and that, because of their expertise, the doctors should have known it, is not evidence. *See Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1034 (7th Cir. 2019) (noting that "speculation cannot defeat summary judgment").

Ajala also challenges the entry of summary judgment on his malpractice claims covering the period from 2010 to 2013. He argues that the doctors' treatment was "obviously" negligent. For these claims to survive summary judgment, Ajala had to present evidence that the doctors "fail[ed] to exercise that degree of care and skill usually employed by the average practitioner under similar circumstances." *Ande v. Rock*, 647 N.W.2d 265, 271 (Wis. App. 2002); *see also Wilson*, 901 F.3d at 823 (applying Wisconsin law). Medical experts are typically needed to establish the standard of care. *Wilson*, 901 F.3d at 823. But, like the district court, we conclude that no matter the standard, Ajala could not demonstrate that the doctors were negligent. As discussed above, Dr. Cox referred Ajala to specialists, monitored his condition, and ordered prescriptions recommended by the specialists; and Drs. Sivalingam and Patel treated Ajala's most persistent problems, ordered tests and labs to assess his kidneys, monitored his asymptomatic stones, and extracted his painful ones. The record contains no evidence that the individualized and frequent treatment provided to Ajala by a team of doctors and specialists fell below the standard of care. *See Wilson*, 901 F.3d at 823 (affirming summary judgment on negligence claim where "team of well-qualified specialists struggled to identify the cause of … pain or to diagnose" the problem).

As for Ajala's claim about medical treatment from Dr. Cox from 2001 to 2010, the district court correctly concluded that it was untimely under Wisconsin's relevant statutes of limitations. *See* WIS. STAT. § 893.53 (2001–2010) (six-year limitations period for § 1983 claims); *see also id.* § 893.55 (2001–2010) (three-year limitations period for malpractice claims). Ajala contends that he challenges one continuing violation by Dr. Cox, but the record does not bear out any ongoing denial of care or maltreatment that persisted from the pre-2010 era. *See Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 517–18 (7th Cir. 2019) (deliberate indifference); *Forbes v. Stoeckl*, 735 N.W.2d 536, 539 (Wis. Ct. App. 2007) (negligence). First, Dr. Cox was not involved in Ajala's care

before he began working at the prison in 2003. Further, Ajala was in a different facility from 2005 to 2007, so any claim against Dr. Cox accrued when he transferred. *See Wilson*, 932 F.3d at 517–18. Lastly, at summary judgment, Ajala made no argument about treatment by Dr. Cox from 2007 to 2010 and submitted no evidence of any interactions in that period.

Ajala next argues that the district court abused its discretion in denying his motions for counsel and a medical expert. *See Giles v. Godinez*, 914 F.3d 1040, 1052 (7th Cir. 2019). We conclude that the court acted within its discretion when it denied Ajala's second and third requests for counsel (after granting the first). There is no right to counsel in civil cases, and a decision to recruit one does not "mean that the court has an indefinite commitment to search until a volunteer is found." *Wilborn v. Ealey*, 881 F.3d 998, 1008 (7th Cir. 2018). Here, the court looked for more than a year for a lawyer to represent Ajala and could not find one. When Ajala renewed his request, the court applied the correct legal standard in concluding that he was a competent litigator with a full grasp of the issues. *See Pruitt v. Mote*, 503 F.3d 647, 658 (7th Cir. 2007) (en banc). We see no abuse of discretion in the court's denial of the request—especially after it had exhausted its resources and Ajala had been transferred out of state.

Nor do we see any abuse of discretion in denying Ajala's first three requests for a medical expert. A district court may appoint an expert if one would help clarify the evidence or decide a key fact. *See Giles*, 914 F.3d at 1053–54. But the district court reasonably concluded when Ajala filed his early motions that it could not yet determine whether the case's dispositive issues would require an expert. *See Romanelli v. Suliene*, 615 F.3d 847, 852 (7th Cir. 2010).

The last explicit ruling on the request for a medical expert was issued just four days before the motion for summary judgment was filed. The court at that time denied the request without prejudice, noting that it rarely recruits medical experts because it is extraordinarily difficult to find an expert willing and able to provide opinions in such cases, and that this was particularly true where the disputed factual issues regarding treatment decisions had not yet been presented to the court through summary judgment briefing. The court stated that it would not recruit an expert until it had reviewed the record and determined that there are factual issues in dispute that could be resolved only with a medical expert. That reasoning by the court is not erroneous, and is in keeping with Federal Rules of Evidence 706, which says that courts can appoint a medical expert when doing so would help the court understand the medical issues, such as the standard of care. See *Giles*, 914 F.3d at 1053–54. The court, in granting

summary judgment, did not reject his malpractice claims based on the failure to provide expert support for his claim; rather, it considered the substance of the claims and determined that no reasonable jury could conclude based on the record that his treatment fell below any reasonable standard of care. Because the court in so holding did not find factual issues in dispute that could only be resolved with a medical expert, its refusal to appoint an expert was not erroneous.

Ajala next challenges the conclusion that the clinic could not be vicariously liable for Drs. Patel and Sivalingam's negligence. But under Wisconsin law, the clinic cannot be liable for the acts of the University of Wisconsin's academic staff. *See* WIS. STAT. § 233.17(2)(b). This includes acts of apparent agents. *See Suchomel v. Univ. of Wis. Hosp. & Clinics*, 708 N.W.2d 13, 20 (Wis. 2005). Drs. Patel and Sivalingam were undisputedly employed by the School of Medicine as academic staff, not by the clinic. Ajala's purported contrary evidence consists of his own attestations—for which he has no basis of personal knowledge—and a filing that was later amended to clarify that the specialists were not employed by the clinic. In any event, there can be no vicarious liability without underlying negligence, and here, there was none.

Finally, Ajala appeals the court's denial of his motion for default judgment, but he gives us no reason to second-guess the district court's conclusion that there is no evidence "that defendants have intentionally misled the court or plaintiff." On appeal, he points to one inaccuracy (Dr. Sivalingam said that Ajala's hypertension medication was for high calcium), one misstatement that was corrected in an amended pleading, and one misunderstanding (though Dr. Cox attested to referring Ajala to the clinic in 2011, and Ajala says he also visited in 2010, in truth Dr. Cox referred Ajala there in 2010, 2011, 2012 and 2013). These are not the type of deliberate misrepresentations that can warrant sanctions. *See Montano v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008).

AFFIRMED